# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 13, 2009 Decided June 19, 2009
Reissued March 11, 2010

No. 08-5004

PUBLIC CITIZEN, INC.,
APPELLANT

v.

OFFICE OF MANAGEMENT AND BUDGET,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 07cv00409)

*Adina H. Rosenbaum* argued the cause for appellant. With her on the briefs was *Brian Wolfman*.

*Alexander D. Shoaibi*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* WILLIAMS.

TATEL, *Circuit Judge*: Seeking to learn which federal agencies submit materials to Congress without prior clearance by the Office of Management and Budget, Public Citizen, a non-profit public interest organization, filed a Freedom of Information Act request for documents related to OMB's legislative and budgetary clearance policies. OMB released redacted versions of fourteen documents, claiming that the redacted portions are protected from disclosure under two of FOIA's nine statutory exemptions—Exemption 2 for predominantly internal documents and Exemption 5 for predecisional and deliberative documents. The district court held that OMB was entitled to withhold the redacted portions of the documents under Exemption 2 and granted summary judgment to OMB. Reviewing de novo, we disagree. Having examined the unredacted documents, we conclude that they do not relate predominantly to OMB's internal practices and are thus unprotected by Exemption 2. And because Exemption 5 requires that materials be both predecisional *and* deliberative, it likewise provides no protection for the majority of the documents' content. We therefore reverse in part and remand for the district court to order the release of the documents with any redaction necessary to protect portions that qualify as both predecisional and deliberative.

## I.

The Office of Management and Budget (OMB), located in the Executive Office of the President and subject to FOIA, *see* 5 U.S.C. § 552(f)(1); *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993), helps the President prepare the federal budget and ensures that legislation, testimony, reports, and policies prepared by other federal agencies are consistent with Administration policy. Two OMB circulars require federal

agencies to clear materials with OMB before submitting them to Congress: Circular No. A-11 covers budget-related materials, and Circular No. A-19 covers proposed legislation, reports to Congress, and congressional testimony. Pursuant to Circular A-19, OMB reviews the submissions, solicits comment from affected agencies, and gives feedback to the proposing agency. Circular A-19 provides that agencies "shall incorporate" OMB's advice in transmitting their legislative proposals to Congress and "shall not submit to Congress any proposal that OMB has advised is in conflict with the program of the President or has asked the agency to reconsider as a result of the coordination process." OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, OMB CIRCULAR NO. A-19, LEGISLATIVE COORDINATION AND CLEARANCE ¶ 8(C) (1979) ("CIRCULAR NO. A-19"). Circular A-19 applies to all executive agencies except those "specifically required by law to transmit their legislative proposals, reports, or testimony to the Congress without prior clearance." *Id.*

Unable to find a publicly available list of agencies that transmit their materials to Congress without prior OMB clearance—so-called "bypass agencies"—Public Citizen filed a FOIA request with OMB. The request asked for:

> (1) All records listing agencies that may directly submit legislative proposals, reports, or testimony to Congress without receiving OMB clearance; (2) [a]ll records listing agencies that may directly submit budget-related materials to Congress without receiving OMB clearance; and (3) [a]ll records explaining that agencies or an agency may directly submit legislative or budget-related materials to Congress without receiving OMB clearance or

providing statutory authority for agencies or an agency to directly submit legislative or budget-related materials to Congress without receiving OMB clearance."

Adina H. Rosenbaum Decl. Ex. A at 1.

In response, OMB identified two documents but refused to release them, claiming they were exempt from disclosure under FOIA. Public Citizen appealed, challenging the decision to withhold the two documents and the adequacy of the search given how few responsive documents it yielded. When OMB denied the appeal, Public Citizen brought this action in the district court. After Public Citizen filed its complaint, OMB, "out of an abundance of caution," Appellee's Br. 5, conducted a second document search, identifying twenty additional potentially responsive documents for a total of twenty-two, including the fourteen documents at issue in this appeal. Although OMB released redacted versions of the fourteen documents, it continued to withhold significant portions of them.

As described in OMB's amended *Vaughn* index, *see Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973), thirteen of the fourteen documents—document 1 and documents 3 to 14—represent the current version and various outdated versions of a memo to OMB staff from OMB's Assistant Director for Legislative Reference. James Jukes Am. Decl. Attach. A at 1. The memo provides "a background discussion of legal and statutory issues related to bypass authorities, a list of the bypass agencies and a summary description of the agencies' budgetary and legislative 'bypass' authorities and a discussion of bypass authority and Inspector[s] General[]." *Id.* The remaining document,

document 2, entitled "Agencies Exempt from the Legislative Clearance Process," is a two-page excerpt from a document called "OMB Roles and Responsibilities." *Id.* OMB describes all fourteen documents as summarizing "the currently-held internal-OMB perspectives and views regarding which Federal agencies have a basis—in statute or in prior agency and OMB practice—for not submitting to OMB, for interagency review, the drafts of their submissions to Congress." Jukes Am. Decl. ¶ 26. According to OMB, then, the documents deal with two kinds of bypass: bypass based "in statute" and bypass based "in prior agency and OMB practice." *Id.*

The portions of the documents OMB released describe agencies with statutorily-based bypass authority. The released portions include straightforward lists of such agencies, as well as more detailed summaries of the statutory basis for their bypass authority. To take just one example, the Chemical Safety and Hazard Investigation Board appears as one of eleven agency names on a list of "Agencies with Statutorily-Based Budgetary and Legislative 'Bypass' Provisions." Adina H. Rosenbaum Supp. Decl. Ex. E at 1. It also appears in a section entitled "Summary Description of Agencies' Statutorily-Based Budgetary and Legislative 'Bypass' Provisions" and is described as follows:

> 2. Chemical Safety and Hazard Investigation Board P.L. 101-549, Sec. 301 (amending Sec. 112(F)(6)(R) of the Clean Air Act; 104 Stat. 2569; 42 USCA Sec. 7412(r)(6)(R)) provides that any budget estimate, request, supplemental request, or information, any legislative recommendation, or prepared testimony submitted to the President or a Federal Agency shall be concurrently transmitted to Congress. No Federal

official or agency can require prior review of the Board's budgetary or legislative communications to the Congress.

*Id.* at 3.

OMB moved for summary judgment as to the undisclosed portions of the documents, claiming that the information they contain is exempt from disclosure under Exemption 2 (predominantly internal documents) and Exemption 5 (predecisional and deliberative documents). Public Citizen also moved for summary judgment, claiming that neither exemption applies. After reviewing the documents *in camera*, the district court granted summary judgment to OMB, holding that the documents were exempt from disclosure under Exemption 2. *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 520 F. Supp. 2d 149, 154–55 (D.D.C. 2007). It thus had no reason to address whether they also qualified under Exemption 5. *Id.* at 156.

Public Citizen appeals, arguing that neither exemption authorizes OMB to withhold the documents. Our review is de novo, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1111–12 (D.C. Cir. 2007), and like the district court, we have reviewed the documents *in camera*. Mindful of OMB's right to seek further review of our decision, we have redacted portions of this opinion to protect the confidentiality of information not yet disclosed, as has our dissenting colleague.

## II.

Enacted "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," the Freedom of Information Act reflects "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language," *Dep't of Air Force v.*

*Rose*, 425 U.S. 352, 360–61 (1976) (internal quotation marks omitted). The Supreme Court has emphasized that "disclosure, not secrecy, is the dominant objective of the Act." *Id.* at 361. FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, 5 U.S.C. § 552(b), which are construed narrowly in keeping with FOIA's presumption in favor of disclosure, *Rose*, 425 U.S. at 361. The agency bears the burden of showing that a claimed exemption applies. *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008). We address each of OMB's claimed exemptions in turn.

*Exemption 2*

Exemption 2 allows agencies to withhold documents that are "related solely to the internal personnel rules and practices of an agency." § 552(b)(2). Despite the statute's reference to documents related "solely" to internal rules and practices, we have interpreted Exemption 2 to cover documents that are "predominantly internal" and that meet one of two additional requirements. *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc). The first, known as the "low 2" exemption and not at issue here, applies to predominantly internal materials that relate to "trivial administrative matters of no genuine public interest." *Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992) (internal quotation marks omitted). The second, known as the "high 2" exemption, *id.*, and claimed by OMB in this case, applies to predominantly internal materials if their disclosure "significantly risks circumvention of agency regulations or statutes," *Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728, 732 (D.C. Cir. 2008) (internal quotation marks omitted).

We have confronted the "high 2" exemption in two key cases. In *Jordan v. United States Department of Justice*, 591

F.2d 753 (D.C. Cir. 1978), we ordered the release of prosecutorial guidelines used by United States Attorneys, finding that the guidelines fail to qualify as predominantly internal. We explained that the guidelines are not "personnel" rules and thus fall outside the statutory exemption for documents "related solely to the internal personnel rules and practices of an agency." *Id*. at 763. We also emphasized that the guidelines have a "definite impact on the public." *Id.* In *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, which we heard en banc, we retreated from *Jordan*'s reliance on Exemption 2's use of the term "personnel," but nonetheless affirmed *Jordan*'s holding that the guidelines were not predominantly internal. 670 F.2d 1051, 1073–75 (D.C. Cir. 1981). We reasoned: "The guidelines on prosecutorial discretion are instructions to agency personnel (e.g., prosecutors) on how to regulate members of the public. Knowledge of those regulations may be as significant to members of the public as is knowledge of statutory sentencing provisions." *Id.* at 1075. As to the document at issue in *Crooker* itself—a Bureau of Alcohol, Tobacco and Firearms manual describing law enforcement surveillance techniques— we concluded that it qualified as predominantly internal because it "is not concerned with regulating the behavior of the public, but consists solely of instructions to agency personnel" and does not "attempt to modify or regulate public behavior only to observe it for illegal activity." *Id.*

Here the district court held that the OMB documents are predominantly internal because they "offer guidance to OMB officials regarding other agencies' ability to bypass presidential review of those agencies' budgetary and/or legislative recommendations," because the information they contain "is plainly intended for internal use only," and because there is "no evidence that the documents have ever been circulated to (or relied upon by) individuals outside of

the Agency." *Pub. Citizen*, 520 F. Supp. 2d at 155. Echoing these reasons, OMB now argues that the documents are predominantly internal because they have never been released outside OMB, are used by OMB personnel in internal policy discussions, and contain "'a description of the views and perspectives of OMB officials' interpretations of the views of certain agencies regarding legislative clearance requirements,'" Appellee's Br. 12 (quoting Jukes Am. Decl. Attach. A at 1). OMB also insists that the documents are predominantly internal because they concern other government agencies, not the public at large, and because they merely serve as briefing materials for OMB personnel and thus seek to regulate no one.

We can easily dispense with several of these arguments. To begin with, the mere fact that the documents were intended for internal OMB use and have never been circulated outside the agency cannot alone render them "predominantly internal." *See Morley v. CIA*, 508 F.3d 1108, 1125 (D.C. Cir. 2007) ("[Exemption 2] does not shield information on the sole basis that it is designed for internal agency use." (internal quotation marks omitted)). Otherwise, agencies could effectively avoid disclosure of any manner of information simply by stamping it "for internal use only." Indeed, OMB itself seems to acknowledge as much, pointing out that the district court relied on other factors beyond OMB's treatment of the documents as internal. Appellee's Br. 22.

Nor is the documents' use in internal discussions conclusive. Agencies regularly refer to policies and regulations as part of internal discussions without rendering such policies (particularly those with significant external impact) predominantly internal. For example, one could easily imagine conversations within the U.S. Attorney's office in which agency personnel discuss the prosecutorial

guidelines we found not predominantly internal in *Jordan*. Such internal discussions would neither diminish the extent to which the guidelines "regulate members of the public" nor reduce the significance of "[k]nowledge of those regulations . . . to members of the public," *Crooker*, 670 F.2d at 1075.

OMB's claim that the documents qualify for Exemption 2 because they concern other government agencies rather than the public at large likewise fails. Exemption 2 covers documents that are "related solely to the *internal* personnel rules and practices of *an* agency." § 552(b)(2) (emphasis added); *see also Vaughn*, 523 F.2d at 1151 (Leventhal, J., concurring). For Exemption 2 to apply, then, the documents would have to relate predominantly to the internal practices of OMB itself, not of the government as a whole. In *Vaughn v. Rosen*, we concluded that Civil Service Commission materials dealing with *other* government agencies' personnel practices were not covered by Exemption 2. 523 F.2d at 1143. As Judge Leventhal explained in his concurring opinion:

> [T]he Federal Personnel Manual, issued by the Commission for government-wide application, could certainly not be withheld from the public in reliance on exemption 2; its subject is federal personnel policy, not internal personnel policy of an agency. . . . A construction of (b)(2) exempting the Civil Service Commission reports at issue in this case would . . . totally remove the sphere of Civil Service Commission operations from the public eye.

*Id.* at 1151 (Leventhal, J., concurring) (footnotes omitted). So too here. If OMB documents concerning other government agencies were categorically exempt, OMB, which is subject to FOIA and whose primary function involves oversight and

coordination of other government agencies, would be largely exempt from FOIA.

This leaves OMB's argument that like the surveillance manual in *Crooker*, the documents at issue here "'make no attempt to modify or regulate public behavior[,] only to observe it.'" Appellee's Br. 17 (quoting *Crooker*, 670 F.2d at 1075) (alteration in original). Evaluating this argument requires a more detailed understanding of the documents' content, purpose, and use. Public Citizen, which of course has never seen the documents, suspects that they establish which agencies may bypass OMB despite the lack of clear statutory authority to do so and in this way regulate other agencies. OMB disputes this characterization, stating that the documents "do not govern the actions of either OMB personnel or other federal agencies," Appellee's Br. 13, and emphasizing that OMB cannot override Circular A-19's determination that only agencies with statutory authority are allowed to bypass the clearance process, Oral Arg. at 17:00–17:20. But as Public Citizen points out, the titles of the documents suggest just the opposite. For example, document 2, entitled "Agencies Exempt from the Legislative Clearance Process," lists those agencies having statutory bypass authority but also includes a separate block of text, redacted by OMB, suggesting that the list of agencies considered "exempt" from the clearance process includes something more than just those with statutory authority. Indeed, our in camera review demonstrates that this document in fact covers statutorily-based bypass agencies as well as customary bypass agencies, both under the overall heading of agencies "exempt" from the clearance process. Similarly, a section of document 1 broadly entitled "Bypass Agencies" includes both statutory and customary bypass agencies, implying that OMB considers both to be "Bypass Agencies." Moreover, document 1 expressly states that "[f]orty-four Federal

agencies currently have some form of legislative and/or budgetary 'bypass.' [These include] agencies with . . . non-statutory (i.e., 'informal') legislative 'bypasses.'" Mem. from Jim Jukes to OMB Policy Officers and DADs 1 (Feb. 20, 2001) ("2001 Jukes Mem."). On its face, then, document 1 appears to state OMB's policy regarding which agencies "currently have" an informal bypass. And OMB itself describes the documents as containing its "perspectives and views regarding which Federal agencies have a basis—in statute or in prior agency and OMB practice"—for bypassing the clearance process. Jukes Am. Decl. ¶ 26 (emphasis added). OMB may well be correct that it lacks authority to grant a bypass, but by treating some agencies as if they "currently have" an informal bypass, it would seem to be implementing a policy of granting de facto bypasses.

But even if, as OMB insists, it never uses the documents to determine whether to enforce the clearance requirements for a particular agency, the documents do identify those agencies OMB treats differently in its clearance process. Indeed, much like the prosecutorial guidelines found subject to disclosure in *Jordan*, the documents determine OMB's interaction with outsiders—an interaction having real-world effects on the behavior of both bypass and non-bypass agencies. For example, as part of the Circular A-19 clearance process, OMB refers proposed legislation to affected agencies for comment. When referring such materials to a bypass agency, however, OMB, acting pursuant to its "longstanding practice," follows a different procedure: "In general, an OMB referral is not made to a 'bypass' agency unless the agency agrees to refrain from forwarding to Congress OMB-referred material or its response to an OMB referral." 2001 Jukes Mem. 1. The documents thus list those agencies required by OMB to act differently than most federal agencies, either by agreeing not to forward OMB materials to Congress or by

commenting only informally or not at all on submissions from other agencies. In addition to depriving listed bypass agencies of a full opportunity to submit formal comments, this policy affects the feedback that non-bypass agencies receive and must incorporate into their congressional submissions. The list of bypass agencies thus stands in marked contrast to the publicly available policy reflected in Circulars A-11 and A-19. As we have repeatedly explained, FOIA provides no protection for such "secret law" developed and implemented by an agency. *See, e.g.*, *Nat'l Treasury Employees Union v. U.S. Customs Serv.*, 802 F.2d 525, 531 (D.C. Cir. 1986).

According to the dissent, the documents deal only with peripheral activity as opposed to agencies' primary conduct. Specifically, the dissent views the referral process as mere "bureaucratic information exchange," Dissenting Op. at 9, but Circular A-19 makes plain that this process is central to the clearance function. One of the main purposes of the clearance process is to "assure appropriate consideration of the views of all affected agencies." CIRCULAR NO. A-19 ¶ 3. Upon receiving a submission from a non-bypass agency, OMB "undertake[s] the necessary coordination with other interested agencies of an agency's proposed legislation or report," including requesting "other agency views within specified time limits." Id. ¶ 8(a)(1). Referral of an agency submission to other agencies for comment thus represents a key part of the legislative clearance process. As such, the referral policy does more than merely "influence" the behavior of other agencies. It limits or even eliminates the role bypass agencies play in clearing proposals submitted by non-bypass agencies, even when such proposals affect the bypass agencies' own functions. This policy in turn determines the scope of advice OMB provides to non-bypass agencies, advice that those agencies must incorporate into their congressional submissions.

The dissent also rejects the view that the documents in fact determine which agencies may bypass the clearance process, describing their "real purpose" as limited to the inter-agency referral process. Dissenting Op. at 3. As noted above, however, on their face the documents strongly suggest that they do in fact represent the list of agencies allowed to bypass the process. To be sure, Assistant Director Jukes asserted that the documents do not represent OMB's "official policy" on which agencies may bypass, Jukes Am. Decl. ¶ 28, but an agency may not avoid FOIA by deeming its de facto policy "unofficial." Moreover, Jukes himself describes the documents as summarizing OMB's views "regarding which Federal agencies have a basis—in statute *or in prior agency and OMB practice*—for not submitting [materials for OMB clearance]." Id. ¶ 26 (emphasis added). Indeed, the very existence of a policy that treats bypass agencies differently with respect to referral of submissions for interagency comment indicates that the documents in fact contain OMB's policy of acquiescing in the listed agencies' asserted bypass authority. If the listed agencies had no bypass authority, OMB would have no reason to avoid sharing other agency proposals with them.

The dissent says that "we have no basis for inferring" that OMB has authority to subject informal bypass agencies to the clearance process. Dissenting Op. at 5. The documents themselves indicate otherwise. For example, document 1 notes that in some cases OMB "has made no effort in recent memory to subject the [agency] to the requirements of Circular A-19," 2001 Jukes Mem. Attach. at 19. This strongly suggests that there are steps OMB can take to subject agencies to the clearance process. Moreover, at oral argument OMB counsel repeatedly insisted that OMB can require agencies to submit proposed legislation for clearance. For

example, asked whether OMB "even with respect to these agencies not statutorily exempt will for particular pieces of legislation exercise its review function," counsel responded, "[i]f it chooses that it should at a particular time, it will." Oral Arg. at 35:35–36:00. Counsel later reiterated that as to proposed legislation, OMB "always [has] the power as granted by the Executive Order, by the Circular, by the memo of February 15, 2001, to say 'we want to look at this,' and [it] can always do that." *Id.* at 37:24–37:33.

Returning, then, to our analysis, we note that our conclusion that the documents are not predominantly internal applies to the documents in their entirety. Neither the unelaborated list of agency names nor the summaries describing the basis of each agency's informal bypass authority relate predominantly to OMB's internal practices. Where, as here, documents are used to affect the behavior of other agencies, knowing the salient characteristics of agencies that receive differential treatment is as significant to those outside OMB as knowing the agencies' identities. For example, portions of the summaries explain that a particular agency does not in fact submit materials for clearance or that OMB has not attempted to subject a particular agency to the clearance process. Such statements implicate the same concerns as the list of agency names; by explaining OMB's policy of treating certain agencies differently, they have significant external effects on the behavior of other agencies and are thus not related predominantly to OMB's internal practices.

As applied to the summary descriptions, OMB's argument that the documents are predominantly internal because they embody OMB's "interpretations of the views of certain agencies regarding legislative clearance requirements," Appellee's Br. 12, also fails. To begin with,

the summaries hardly seem interpretive: they consist primarily of quotations from agencies' governing statutes and statements that a given agency interprets a particular statute as authorizing bypass, that it lacks a statutory bypass, or that it declines to submit materials for clearance. Indeed, only one sentence in any of the summaries even hints at an OMB view or perspective: one agency's de facto bypass, it says, "could be" based on a particular section of the agency's governing statute. 2001 Jukes Mem. Attach. at 19. But even if such statements represent OMB's interpretations of other agencies' views, they nonetheless describe possible bases for bypass authority in which OMB acquiesces. As such, they are themselves significant in explaining the different requirements imposed on certain agencies.

Finally, the documents at issue here lie at the core of what FOIA seeks to expose to public scrutiny. They explain how a powerful agency performing a central role in the functioning of the federal government carries out its responsibilities and interacts with other government agencies. As we have explained, "the strong policy of the FOIA [is] that the public is entitled to know what its government is doing and why." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980). Where, as here, agency documents have significant external effects on other government agencies, they are not "predominantly internal" within the meaning of Exemption 2.

Because the documents Public Citizen seeks are not related predominantly to OMB's internal practices, we have no need to decide whether they meet the high 2 exemption's second element—that their release would significantly risk circumvention of the law. *See Crooker*, 670 F.2d at 1075 (reiterating that the prosecutorial guidelines in *Jordan* would be subject to disclosure because "even assuming that the

guidelines . . . may aid some individuals in evading the law, [they] are not 'predominantly internal'"). We thus turn to OMB's alternative claim that the documents are covered by Exemption 5.

*Exemption 5*

Exemption 5 allows agencies to withhold documents that would be protected from disclosure in litigation under one of the recognized evidentiary or discovery privileges, such as the attorney-client privilege. *Coastal States*, 617 F.2d at 862. Here the privilege at stake is the deliberative process privilege, which

> serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Id.* at 866. Thus, as embodied in Exemption 5, the privilege protects documents that are both "predecisional" and "deliberative." *Id.* "We deem a document predecisional if it was generated before the adoption of an agency policy and deliberative if it reflects the give-and-take of the consultative process." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (internal quotation marks omitted). OMB claims that the documents at issue here are all predecisional and deliberative and thus covered by Exemption 5.

We begin with OMB's response to Public Citizen's argument that even if the documents were at one time predecisional and deliberative, OMB's informal adoption and application of the documents as its "working law" render them final and thus subject to disclosure. *See Coastal States*, 617 F.2d at 866 (explaining that "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue"). OMB claims that because of its "unique role and position in the Executive Branch" as advisor to the President, Appellee's Br. 45, its documents are "'by their nature'" predecisional and deliberative and cannot constitute "'working law,'" *id.* at 44 (quoting *United States v. Philip Morris USA Inc.*, 218 F.R.D. 312, 321 (D.D.C. 2003)). OMB's advisory role may well mean that some—indeed, even many—documents it produces are predecisional in nature, but the blanket application of Exemption 5 it seeks goes too far: carried to its logical conclusion, the argument would exempt virtually all OMB documents from disclosure. We have no doubt that OMB frequently produces documents that contain recommendations, but such documents are hardly contagious, spreading their predecisional and deliberative nature to all other documents in their vicinity. Documents qualify as predecisional and deliberative only if they "reflect[] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy." *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 677 (D.C. Cir. 1981). To the extent the documents at issue in this case neither make recommendations for policy change nor reflect internal deliberations on the advisability of any particular course of action, they are not predecisional and deliberative despite having been produced by an agency that generally has an advisory role. And although it might well be difficult to

determine at what point OMB's recommendations about the suitability of a particular piece of proposed legislation have been sufficiently adopted to qualify as "working law," we face no such difficulty here. Documents reflecting OMB's formal or informal policy on how it carries out its responsibilities fit comfortably within the working law framework.

OMB argues that the documents Public Citizen seeks are in fact predecisional because OMB "consider[s]" the documents "during the inherently deliberative process of legislative clearance." Appellee's Br. 41. But we agree with Public Citizen that an agency's application of a policy to guide further decision-making does not render the policy itself predecisional. For example, in *Tax Analysts v. IRS*, we held that IRS documents containing legal advice to field offices were not predecisional because even though they "may precede the field office's decision in a particular taxpayer's case, they do not precede the decision regarding the agency's legal position." 117 F.3d 607, 617 (D.C. Cir. 1997). Similarly, in *Jordan*, where we held that the prosecutorial guidelines were neither predecisional nor deliberative, we reasoned that even though the guidelines "may not be absolutely binding on each Assistant," they "do express the settled and established policy of the U.S. Attorney's Office." 591 F.2d at 774. Here the documents list the agencies to which OMB refers materials for formal comment only after obtaining assurances of confidentiality. Absent such assurances, OMB may well decide on a case-by-case basis whether to request a bypass agency's informal comments on a particular piece of proposed legislation. Such subsequent decisions, however, do not undermine the finality of the existing policy, which singles out the agency for differential treatment in the first place.

Urging a second basis for classifying the documents as predecisional, OMB argues that they "serve as a starting point for discussions within OMB concerning possible changes to OMB's practices." Appellee's Br. 35. This argument gets OMB only so far. As Public Citizen correctly notes, Appellant's Reply Br. 18, whenever an agency seeks to change a policy, it logically starts by discussing the existing policy, and such discussions hardly render documents explaining the existing policy predecisional. Otherwise it would be hard to imagine any government policy document that would be sufficiently final to qualify as non-predecisional and thus subject to disclosure under FOIA. In any event, Exemption 5 protects only documents that are *both* predecisional *and* deliberative. As we explained in *Jordan*, "it is not enough that a communication precede the adoption of an agency policy." 591 F.2d at 774. To qualify under Exemption 5, a document must also "'be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters.'" *Id.* (quoting *Vaughn*, 523 F.2d at 1143–44). A document that does nothing more than explain an existing policy cannot be considered deliberative. *E.g.*, *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Nor may an agency avail itself of Exemption 5 to shield existing policy from disclosure simply by describing the policy in a document that as a whole is predecisional, such as a memo written in contemplation of a change in that very policy. Only those portions of a predecisional document that reflect the give and take of the deliberative process may be withheld. *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (explaining the difference between the predecisional requirement and the deliberative requirement and noting that agencies may withhold only those portions of a predecisional document that are also deliberative). Here the documents list agencies that "currently have" formal or informal bypass

authority.  Significantly for our purposes, the documents nowhere consider whether OMB should cease acquiescing in a particular agency's practice of bypassing OMB.  Indeed, document 2 merely lists agency names—it offers no commentary whatsoever.  Similarly, portions of documents 1 and 3 to 14 list the agencies and give the reasons for their inclusion on the list, and as we've explained, the reasons behind existing policy—such as OMB's policy of treating certain agencies differently—are not deliberative.  To the extent documents 1 and 3 to 14 go beyond describing and explaining the existing policy and current state of affairs, OMB may withhold only those portions that provide candid or evaluative commentary.

Moreover, agencies must disclose those portions of predecisional and deliberative documents that contain factual information that does not "inevitably reveal the government's deliberations."  *In re Sealed Case*, 121 F.3d at 737.  The list of bypass agencies consists of just such factual information, i.e., the names of agencies that, in fact, generally decline to submit materials for OMB clearance.  While OMB may be right that such a list does not establish the "fact" that an agency actually possesses undisputed legal authority to bypass OMB, it does represent a "fact" about the agency's behavior—specifically, that the agency does or does not submit materials to OMB.  As OMB counsel explained, some agencies that had initially bypassed OMB without statutory authority later asked OMB to review their submissions, and as a result "they've been removed from the list."  Oral Arg. at 42:20–42:38.  Exemption 5 provides no protection for such factual information.

Because Exemption 5 covers only those portions of the documents that are both predecisional and deliberative, OMB has failed to meet its burden of demonstrating that Exemption

5 covers the documents in their entirety. Accordingly, OMB must release all responsive portions of document 2, as well as all portions of documents 1 and 3 to 14 that are not both predecisional and deliberative. Although the district court determined that all segregable portions of the documents had been released, *Pub. Citizen, Inc.*, 520 F. Supp. 2d at 157–58, it evaluated the documents only under Exemption 2, which we have concluded does not apply, *see supra* at 13. The Exemption 5 segregability analysis requires a different inquiry, one that focuses on the predecisional and deliberative nature of the documents' content. As to documents 1 and 3 to 14, then, we think it best for the district court to conduct this inquiry in the first instance.

## III.

For the foregoing reasons, we reverse in part and remand for the district court to order the release of document 2; to determine consistent with this opinion whether certain limited portions of documents 1 and 3 to 14 are predecisional and sufficiently reflect the give and take of the deliberative process to warrant continued redaction; and to order the release of those documents with appropriate redaction if necessary.

*So ordered.*

WILLIAMS, *Senior Circuit Judge,* concurring in part and dissenting in part: This case concerns fourteen documents relating to the role of the Office of Management and Budget ("OMB") in clearing executive (and "independent") agencies' legislative and budget proposals to Congress. The appellant, Public Citizen, contends that the Freedom of Information Act ("FOIA") requires OMB to disclose these documents in their entirety. OMB argues that the undisclosed portions of the documents are exempt from disclosure under FOIA Exemptions 2 and 5. The district court granted summary judgment to OMB on the basis of Exemption 2. The majority today finds Exemption 2 inapplicable, and remands for further consideration of Exemption 5. I believe that OMB established the first of two requirements for withholding under Exemption 2, and that the case should be remanded for clarification as to the second requirement. I concur, however, in the court's disposition of OMB's assertion of Exemption 5.

\* \* \*

Exemption 2 covers documents that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). We have long interpreted the exemption more broadly than its language immediately suggests. As currently understood, the exemption's threshold requirement is that the documents must be "used for predominantly internal purposes." *Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992) (quoting *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1073 (D.C. Cir. 1981)). Documents satisfying that criterion may be withheld if they "deal with trivial administrative matters" (the "low 2" exemption) or if "disclosure . . . would risk circumvention of agency statutes and regulations" (the "high 2" exemption). *Id.* As the documents clearly deal with non-trivial matters, the "high 2" exemption is the relevant one. I will discuss the two

requirements—predominant internality and circumvention of law—in turn.

*Predominant internality.* Whether these documents are predominantly internal depends on their content and function. Public Citizen understandably inferred from the titles of the documents—for example, "Agencies Exempt from the Legislative Clearance Process"—that they contain OMB's policies regarding which agencies may bypass the clearance process by which OMB reviews agency submissions to Congress. In addition, the documents were supplied by OMB in response to a request for records "listing agencies that may" directly submit legislative and budget proposals to Congress without OMB clearance. Plaintiff's inference, nonetheless, is a bit of an oversimplification.

First, the Assistant Director for Legislative Reference of the OMB stated flatly in his affidavit that the documents "do not represent or set forth OMB's 'official position' (so to speak) regarding which agencies may, or may not, submit legislative materials directly to Congress." Jukes Am. Decl. at 14. See also Office of Mgmt. & Budget, Executive Office of the President, OMB Circular No. A-19, Legislative Coordination and Clearance (1979), posted at http://www.whitehouse.gov/omb/circulars/a019/a019.html ("Coverage. All executive branch agencies (as defined in section 5b) are subject to the provisions of this Circular, except those agencies that are specifically required by law to transmit their legislative proposals, reports, or testimony to the Congress without prior clearance.").

Second, in camera examination shows that insofar as the documents guide the conduct of OMB personnel at all, they do so in relation not to the *clearance* process but to another

aspect of OMB's relation to agencies. The documents contain no instructions to OMB personnel to allow some agencies but not others to bypass the clearance process. Documents 1 and 3-14, which are memos from the OMB's Assistant Director for Legislative Clearance to OMB staff, do contain other instructions making clear the documents' real purpose. Specifically, the memos instruct the OMB staff not to automatically *refer* material to "bypass" agencies, so as to avoid letting the agencies forward such material to Congress. See, e.g., Jim Jukes, Memorandum for OMB Policy Officers and DADs [acronym unexplained] (Feb. 20, 2001) ("[The Legislative Reference Division's] longstanding practice is to determine, on a case-by-case basis, whether or not to refer material for review to a 'bypass' agency. . . . In general, an *OMB referral is not made* to a 'bypass' agency unless the agency agrees to refrain from forwarding to Congress OMB-referred material or its response to an OMB referral.") In other words, to the extent that the documents had a function beyond explaining what bypasses are and which agencies have *asserted* a right to bypass, it was to instruct employees on how those agencies should be treated in the referral process.

The majority opinion hints that the memos contain a policy concerning which agencies may bypass the clearance process. It relies on Document 1's statement that "[f]orty four Federal agencies currently have some form of . . . 'bypass.'" Maj. Op. at 12 (quoting Jim Jukes, Memorandum for OMB Policy Officers and DADs (Feb. 20, 2001)). In context, though, it is clear that this is a statement of fact concerning which agencies have asserted bypass authority, not an endorsement of their claims or even a statement of OMB assessment of or response to those claims. See Bypass Agencies 5 (Feb. 2001) (explaining that informal bypasses are

asserted by several agencies without explicit authority, and that although Circular A-19 does cover these agencies they "generally do not comply with its provisions.").

The panel's next argument on this point similarly confuses a factual statement with a policy. It relies on the Assistant Director's statement that the documents "seek to summarize the currently-held internal-OMB perspectives and views regarding which Federal agencies have a basis—in statute or in prior agency and OMB practice—for not submitting [materials for OMB clearance]." Jukes Am. Decl. at 13. All this means, however, is that the documents list all the agencies which may view themselves as exempt from the clearance process, whether this is because of a statute, the agency's own prior practice, or some combination of the agency's practice and OMB's response to it. Consider, for example, Document 1's treatment of the Federal Trade Commission "FTC": "The FTC has no statutory legislative bypass but acts as if it does . . . . OMB has made no effort in recent memory to subject the FTC to the requirements of Circular A-19." Bypass Agencies 19 (Feb. 2001). The document explains why the FTC might have a "basis" in its own practice, as well as OMB's recent actions, to think of itself as a bypass agency. It does not, however, endorse the FTC's claim to bypass authority or adopt a policy of not attempting to get the FTC to comply with Circular A-19.

The panel further argues that if the documents really just recorded past OMB practice—rather than setting out a policy of OMB acquiescence in these agencies' behavior—OMB would not worry about sharing information with them. As my colleagues put it, "If the listed agencies had no bypass authority, OMB would have no reason to avoid sharing other agency proposals with them." Maj. Op. at 14. Again the

analysis confuses a pattern of successful agency bypass with OMB policy. Even if OMB made every possible effort to subject the FTC or some other informal bypass agency to Circular A-19, it would still sensibly worry about sharing information with that agency—unless and until its efforts proved successful. The panel's theory simply assumes that OMB has enforcement power; but we have no basis for inferring such power's existence.

In support of its view the panel invokes a couple of passages from oral argument. I hesitate to draw serious conclusions from a muddled colloquy in which the judges more than once declared that they could not understand counsel's answers. Oral Arg. at 35:30-35:35; *id* at 36:05-36:15. As the panel's conviction that the materials disclose "secret law" turns on an understanding of OMB enforcement power, we should at the very least remand for a determination that such power exists rather than rely on inferences from highly ambiguous statements at oral argument by a counsel to whom our questions appeared extremely unclear.

In any event, counsel's answers fall far short of a clear claim to effective power to insist that all agencies submit proposals for OMB review before submission to Congress. The statement of OMB counsel at oral argument that OMB "always [has] the power as granted by the Executive Order, by the Circular, by the memo of February 15, 2001 to say 'we want to look at this,' and [it] can always do that," see Maj. Op. at 15 (quoting Oral Arg. at 37:24-37:33), does nothing to establish enforcement power. Quite literally, counsel observed that OMB had the power to "*say*" to agencies that they should turn over the specified type of document. It brings to mind Hotspur's famous rejoinder to Glendower:

Glendower: I can call spirits from the vasty deep.

Hotspur: Why, so can I, or so can any man; But will they come when you do call for them?

At most it suggests that OMB has a legal right to require certain agencies to participate in the clearance process, quite distinct from an effective enforcement power.

The majority also points to an exchange in which a judge asked counsel whether OMB "even with respect to those agencies not statutorily exempt will for particular pieces of legislation exercise its review function," and counsel responded, "if it chooses that it should at a particular time, it will." Maj. Op. at 15 (quoting Oral Arg. at 35:35-36:00). Counsel was primarily asserting that OMB can't make "any decisions about agencies and their ability to go around OMB," Oral Arg. at 34:30-34:38. But it does, he argued, have some discretion with regard to specific legislative proposals: "It can make a decision, for example, when a [proposed?] statute comes to it, that this particular statute does not need to go through a review process." *Id.* at 34:59-35:05. Counsel's answer to the question, then, merely reaffirms his point that OMB has discretion over "particular pieces of legislation." It does not establish that agencies would comply, and it certainly does not establish that pieces of legislation would "come to [OMB]" *before* going to Congress. Indeed, elsewhere counsel noted that OMB frequently does not even know about agencies' legislative proposals until they are introduced in Congress. Oral Arg. at 36:21-36:33. In short, the OMB's own description of the documents is fair: the documents "serve as the OMB's 'intelligence' on other agencies' views regarding the nature of their obligations in the legislative clearance process" and they are used to help OMB personnel

"determine the nature of their interactions" with those agencies.  Appellee's Br. at 13.

We must evaluate these documents under the predominant internality test established in *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1073 (D.C. Cir. 1981), read in the light of the *Crooker* en banc court's preservation of the holding of an earlier case, *Jordan v. DOJ*, 591 F.2d 753, 763 (D.C. Cir. 1978).  In *Jordan* we had held that the Justice Department's prosecutorial guidelines did not fall within the scope of Exemption 2.  *Crooker* rejected much of *Jordan*'s legal analysis, 670 F.2d at 1073, and held that an agent's training manual of the Bureau of Alcohol, Tobacco & Firearms (BATF), governing law enforcement investigation techniques, was covered by Exemption 2 because it was predominantly internal and its disclosure significantly risked circumvention of the law, *id.* at 1053.  *Crooker* said, however, that its new approach would not have changed the result in *Jordan* because nothing in the *Jordan* opinion suggested that disclosure would risk circumvention of the law and, in any event, the documents at issue were not predominantly internal. *Id*. at 1075.

*Crooker* conceded that the investigatory technique policies described in the withheld portions of the BATF manual had an effect on the public at large, as would almost any agency policy.  *Id*. at 1073.  The court found "critical," however, that "the manual is used for predominantly internal purposes; it is designed to establish rules and practices for agency personnel . . . ; it involves no 'secret law' of the agency . . . ."  *Id.*  The prosecutorial guidelines in *Jordan*, on the other hand, were "a source of 'secret law,' as important to the regulation of public behavior as if they had been codified." *Id.* at 1075.

As applied to documents by which an agency guides its personnel in conduct affecting others, the distinction our cases draw seems a bit metaphysical, i.e., difficult to operationalize. As to any such document, it is possible to assert, with equal plausibility, that its "primary" purpose is to guide the agency's employees *or*, by guiding the employees' conduct, to affect the outside world. The puzzle is highlighted by *Schiller v. NLRB*, 964 F.2d 1208 (1992), where we confronted documents concerning the NLRB's litigation strategies with reference to the Equal Access to Justice Act. Of course the "prosecutorial strategies" at issue in *Jordan* might be viewed as simply a subset of "litigation strategies." Yet, while the NLRB strategies clearly affected outsiders—and were presumably intended to influence the other parties' behavior—we said that they merely "establish[ed] rules and practices for agency personnel, and Mr. Schiller has given us no reason to think that the documents contain any 'secret law.'" *Id.* at 1207. Accordingly we found them predominantly internal. Similarly, in *Nat'l Treasury Employees Union v. U.S. Customs Serv.* ("*NTEU*"), 802 F.2d 525, 531 (D.C. Cir. 1986), we classified statements of criteria for agency employment as predominantly internal (a conclusion indirectly bolstered, of course, by the documents' clearly relating to "personnel").

Must we then throw up our hands and arbitrarily choose one of two contradictory assertions? I think not. Two features may usefully distinguish *Jordan* from the three later cases. As we described *Jordan* in *Crooker*, the strategies we characterized as secret law were "as important to the regulation of public behavior as if they had been codified." 670 F.2d at 1075. To the extent that the prosecutorial guidelines were the equivalent of flat-out no-prosecution rules, they switched the conduct in question from unlawful to

de facto lawful, as would, for example, a clear determination not to prosecute marijuana offenses. Thus they (1) impacted primary conduct and, as we understood them, (2) they did so unequivocally ("as if they had been codified"). By contrast, the investigative techniques in *Crooker*, the litigation strategies in *Schiller*, and the employment criteria in *NTEU* appear to have been aimed at peripheral activity: in *Crooker* at parties' concealment strategies; in *Schiller* at their behavior in agency adjudications; in *NTEU* at their role as job applicants. (Of course if persons dedicated to a career with the U.S. Customs were fully informed about the documents withheld in *NTEU*, they might mold their career paths to meet its interests; but such an effect seems remote enough to justify our having viewed the documents as predominantly internal.)

At bottom, the policy expressed in the documents here is no more than a set of instructions to agency staff on how to bargain with other agencies on an issue much less connected to their primary conduct than submission to OMB approval of their legislative or budget proposals, to wit, the dissemination of information. See Jukes Memorandum (Feb. 20, 2001). This external effect seems about as remote from the public's primary conduct as one can imagine. Nor do these documents regulate the primary conduct of other agencies (assuming for the moment that doing so would bring them within the scope of *Jordan*); they deal only with the agencies' horse-trading with OMB on issues of bureaucratic information exchange—the referral process. The panel characterizes that process as "a key part of the legislative clearance process." Maj. Op. at 13. But OMB's referral leverage strategies seem to stand in relation to the basic clearance process in much the way the criminal investigative procedures, administrative litigation strategies, and agency employment criteria at issue in *Crooker*, *Schiller* and *NTEU* relate to criminal law

enforcement, administrative policy, and agency management of personnel, i.e., so peripherally to the affected subjects' primary conduct that they are properly seen as "predominantly internal."

Second, the documents are not at all comparable to any kind of codification; within their mandate, one can easily imagine temporary, partial accommodations. While the bargaining strategy may well force other agencies to make a choice, it is a far cry from the decriminalization of a whole class of conduct.

The majority summarizes its view with the declaration that where "agency documents have significant external effects on other government agencies, we cannot deem them 'predominantly internal.'" *Id.* at 16. I note that this is the first case ever in which a document's "external effects" operate in the first instance on other federal agencies. I do not regard that fact as dispositive: if the initial impact fell on another government agency in such a way as to have clearly defined effects on the public's primary conduct, it would not make sense to view the documents as "predominantly internal." And quite possibly an agency policy seriously impacting *other agencies' primary conduct* would fail the internality test. Neither effect is present here. The case fits comfortably within *Crooker*, *Schiller* and *NTEU*.

*Circumvention of the law.* The second prong of the "high 2" exemption is met if "disclosure would significantly risk circumvention of agency regulations or statutes." *NTEU*, 802 F.2d at 528. *NTEU* illustrates how we apply the criterion. There we observed that because the agency's evaluation procedures were supposed to measure "actual experience and proven ability," in theory "advance knowledge of their content

should not affect the rating of the candidates." *Id.* at 529. This conclusion would hold, however, only "if all applicants can be depended upon to be meticulously correct in describing their past experience and their quantified or quantifiable abilities." *Id.* In fact, affidavits from agency individuals suggested that applicants could embellish many aspects of their applications "in a manner that is not strictly fraudulent, or that cannot be proven to be fraudulent." *Id.* In light of these affidavits, we found "that release of the plans creates a significant risk that the Service's applicant evaluation program will be seriously compromised." *Id.*

Here OMB expresses the concern that if other agencies "knew OMB's beliefs concerning their views or the views of sister agencies, they could use this information to impede and frustrate legislative clearance requirements," Appellee's Br. at 26, thus circumventing the legislative clearance process set out in Circular A-19. Thus the claim does *not* appear to relate to the documents' normative instructions on referral of documents to bypass agencies. As in *NTEU*, in theory the information in the documents should not affect whether or not an agency is subject to the clearance process. In practice, however, this may hold only if agencies approach the process with meticulous integrity. It is not fanciful to imagine that they might change their behavior in response to the information. Indeed, the majority believes that the explanation of OMB's policies has "significant external effects on the behavior of other agencies." Maj. Op. at 15. To the extent that agencies are willing to game the system, the information in these documents could help them do so.

OMB's submissions on this issue, however, are on the vague side. The Assistant Director for Legislative Reference of the OMB said in his affidavit that disclosure of these

materials "would reveal aspects of OMB's evaluative process concerning submission of agencies' documents to Congress without OMB's clearance and the manner in which relevant opinions and recommendations were formed." Jukes Decl. at 11. But this statement, rather than being addressed directly to circumvention, seems simply to assert the raw truism that forced disclosure will reveal something about OMB's thinking process. The issue, though, is how agencies might use those insights to undermine OMB's efforts to assure compliance. The record on that problem being too opaque for a well-founded decision, I would remand to the district court for further proceedings. See *Sussman v. United States Marshal Serv.*, 494 F.3d 1106, 1113 (D.C. Cir. 2007).

\* \* \*

My colleagues argue that the documents at issue in this case "lie at the core of what FOIA seeks to expose to public scrutiny." Maj. Op. at 16. Disclosure is, of course, FOIA's primary policy. See *Crooker*, 670 F.2d at 1074. But as *Crooker* reminds us, "it will not do for us to act on the primary purpose of the statute to the exclusion of all other express congressional concerns," such as "preserving the effective operation of governmental agencies." *Id.* Here, the effectiveness potentially at stake is the President's ability to corral the government's far flung agencies, many if not all of them beholden to interest groups whose agenda may not track the President's, into support of a common, coherent program. A fair application of the test developed by *Crooker* demonstrates that the documents are predominantly internal. If further proceedings establish that their disclosure risks circumvention of the law, as seems quite plausible, OMB should be able to protect them. I would therefore remand for a better grounded decision on the circumvention issue.