Brennan Center for Justice v. Department of Justice

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued:  February 21, 2012        Decided:  September 19, 2012)

Docket No. 11-4599

------------------------------------

Brennan Center for Justice at New York University School of Law,

Plaintiff-Appellee,

- v -

United States Department of Justice, United States Agency for International Development, United States Department of Health and Human Services,

Defendants-Appellants.[*]

------------------------------------

Before:    CALABRESI, SACK, and HALL, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York (Victor Marrero, Judge) granting the plaintiff's motion for summary judgment and denying the defendants' cross-motion for summary judgment.  The court ordered disclosure by the defendants of three memoranda prepared by the Department of Justice's Office of Legal Counsel because they were not covered by the deliberative process

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

exemption, 5 U.S.C. § 552(b)(5), from the general requirement of disclosure contained in the Freedom of Information Act.  We conclude that one such memorandum was incorporated by reference in a USAID document such that the protection of the exemption was surrendered, but that the other two were not and retain their exempt status.

Affirmed in part; reversed and remanded in part.

Appearances:          DOROTHY HEYL (Elizabeth M. Virga, on the brief) Milbank, Tweed, Hadley & McCloy LLP, New York, New York, for Plaintiff-Appellee.

SHARON SWINGLE (Benjamin H. Torrance, Sarah S. Normand, Beth S. Brinkmann, Michael S. Raab, on the brief), for Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, for Defendants-Appellants.

Melanie Sloan, Anne L. Weismann, Adam J. Rappaport, Citizens for Responsibility and Ethics in Washington, Washington, DC; David L. Sobel, Electronic Frontier Foundation, Washington, DC; Mark Rumold, Electronic Frontier Foundation, San Francisco, California, amici curiae.

SACK, Circuit Judge:

The defendants, the United States Department of Justice ("DOJ"), the United States Department of Health and Human Services ("HHS"), and the United States Agency for International Development ("USAID"), appeal from a judgment of the United States District Court for the Southern District of New York

2

(Victor Marrero, Judge) granting a motion for summary judgment by the plaintiff, the Brennan Center for Justice at New York University School of Law ("Brennan Center"), denying the defendants' cross-motion for summary judgment, and, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, ordering the release of three memoranda prepared by the DOJ's Office of Legal Counsel ("OLC").  For the reasons that follow, the judgment of the district court is affirmed with respect to one of these memoranda, and reversed and remanded with respect to the other two.

**BACKGROUND**

In 2003, Congress enacted the two statutes that provide the factual backdrop for this litigation: the United States Leadership Against HIV/AIDS, Tuberculosis, Malaria Act, 22 U.S.C. §§ 7601-7682. ("Leadership Act"), and the Trafficking Victims Protection Reauthorization Act, 22 U.S.C. §§ 7101-7112. ("TVPRA").  Each included what has become known as the "pledge requirement," purporting to require all organizations that receive funds for HIV/AIDS and anti-trafficking work pursuant to the statutes to have "a policy explicitly opposing prostitution and sex trafficking."  22 U.S.C. § 7631(f); see also 22 U.S.C. § 7110(g)(2).

> After the Leadership Act was enacted, the
> [OLC] . . . warned that applying the Policy
> Requirement to U.S.-based organizations would
> be unconstitutional.  Heeding that warning,

3

[the government] initially refrained from enforcing it against U.S.-based NGOs. OLC subsequently changed course and withdrew what it characterized as its prior "tentative advice," asserting that "there are reasonable arguments to support the constitutionality" of applying the Policy Requirement to U.S.-based organizations, and, starting in mid-2005, the Agencies began applying the Requirement to U.S.-based grantees.

Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 225 (2d Cir. 2011).[1]

On July 14, 2005, the Brennan Center submitted FOIA requests to USAID, HHS, and the OLC for "any and all documents containing guidance" provided by the OLC to any representatives of HHS or USAID "relating to the enforcement" of the pledge requirement. FOIA Request from Brennan Center to HHS at 1 (July 14, 2005), Brennan Center v. Dep't of Justice, No. 11-4599, Joint Appendix ("J.A."), at 248 (2d Cir. Jan. 6, 2012); FOIA Request from Brennan Center to OLC at 1, J.A. 270 (July 14, 2005); FOIA Request from Brennan Center to USAID at 1, J.A. 302 (July 14, 2005). On March 7, 2007, HHS denied the request in its entirety

---

[1] Alliance for Open Society was brought by several organizations, including the Brennan Center, challenging the pledge requirement on First Amendment grounds. We affirmed the district court's decision to preliminarily enjoin that provision of the Leadership Act concluding that it "falls well beyond what the Supreme Court and this Court have upheld as permissible conditions on the receipt of government funds [because it] does not merely require recipients of Leadership Act funds to refrain from certain conduct, but goes substantially further and compels recipients to espouse the government's viewpoint." 651 F.3d at 223.

4

and referred it to USAID and the OLC, from which, it had determined, many of the requested documents originated.[2]  The OLC denied the original request in its entirety, and denied the request referred from HHS except as to a nine-page letter commenting on the TVPRA that was already in the public record, which was sent in September 2003 from a DOJ official to Representative James Sensenbrenner, then-Chairman of the House Judiciary Committee.  USAID did not respond to the referred request, and denied the original request in its entirety.  The Brennan Center appealed the various denials with those agencies, and the agencies affirmed their denials, leaving the Brennan Center with the option of pursuing its claims in federal court.  See 5 U.S.C. § 552(a)(4)(B).

On October 15, 2009, the Brennan Center brought this action in the United States District Court for the Southern District of New York broadly alleging that USAID, OLC, and HHS had violated FOIA by failing to identify responsive documents, failing to disclose records, failing to disclose reasonably segregable portions of otherwise withheld documents, and, with respect to the OLC and USAID, failing to respond to FOIA

---

[2] HHS located 231 pages of responsive documents, and withheld 46 pages in their entirety pursuant to FOIA's deliberative process exemption, see 5 U.S.C. 552(b)(5).  It determined that of the remaining documents, 177 pages originated with the OLC, and 8 pages with USAID, and referred the Brennan Center's request to those agencies.

requests. On January 15, 2010, the defendants provided the plaintiff with an index of withheld documents as required by Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). The Vaughn index included the date of each document withheld, the author and recipient(s), a brief description, the number of pages, and the reason for its being withheld. The district court judge met with the defendants on April 22, 2010, and May 5, 2010, and asked them to consider disclosing some or all of the documents in order to avoid further litigation. In response, the defendants released heavily redacted versions of several documents and associated emails. See Order, Brennan Center v. Dep't of Justice, No. 09 Civ. 8756, at 1-3 (S.D.N.Y. July 1, 2010), ECF No. 16. To the extent that internal agency emails and memoranda are referenced in this opinion, they are part of the record by virtue of this disclosure.

On January 28, 2011, the plaintiff moved for summary judgment seeking release of the entirety of three memoranda that it alleges were improperly withheld pursuant to FOIA's "Exemption 5," which shields from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). That exemption has been interpreted to encompass traditional common law privileges against disclosure, including the attorney-client and deliberative-process

privileges, and the work-product doctrine. <u>Nat'l Council of La Raza v. Dep't of Justice</u>, 411 F.3d 350, 356 (2d Cir. 2005). The three withheld documents that are the targets of the Brennan Center's objections are: (1) a one-page memorandum provided by the OLC to HHS and USAID on or about February 17, 2004, regarding the constitutionality of the pledge requirement (the "February Memorandum"); (2) a July 2, 2004, draft of a formal, but never-finalized, OLC opinion addressing the constitutionality of the pledge requirement (the "July 2 Memorandum"); and (3) a July 29, 2004, draft memorandum similar to the July 2 Memo (the "July 29 Memorandum").

### The February Memorandum

On February 12, 2004, the General Counsel of HHS asked the OLC to provide, on a "very short timeframe," "advice on the constitutional issues raised by the grant restrictions under the two statutes." Memorandum from Renee Lettow Lerner at 2, J.A. 55 (March 12, 2004) (describing HHS request).

In response, on February 17, Renee Lettow Lerner, an OLC attorney, sent an email to HHS Deputy General Counsel Paula M. Stannard and USAID employee John Gardner attaching a one-page memorandum containing at least some of the requested advice.[3]

---

[3] All correspondence regarding the February Memorandum involved both USAID and HHS, although the March 12, 2004, letter suggests the advice was provided only at the behest of HHS. We have not found any explanation in the record for this

7

The memorandum explained that "[i]n the limited time available to us, we have not been able to conduct a comprehensive analysis, but we have reached the following tentative views, which might need to be altered after further analysis."  February Memorandum at 1, J.A. 37.  The document, the first of the three memoranda that are the subject of this litigation, was supplied to the plaintiff during the course of this litigation with all analysis redacted.

In an email later that evening, Stannard conveyed "draft language for the HIV/AIDS and trafficking grant awards/agreements" to Lerner.  Email from Stannard, "Re: OLC's advice on grant announcements," J.A. 40 (Feb. 17, 2004).  She also sent a copy to the USAID employee.  Again, a copy of the email was supplied to the Brennan Center, but most of it was redacted.  Lerner replied to Stannard the following day, February 18, in an email that was, in effect, withheld from disclosure, i.e., it is redacted in its entirety.

On February 19, a USAID employee, acting on behalf of USAID employee Gardner, sent that agency's revised "Acquisition & Assistance Policy Directive" ("AAPD")[4] to Lerner, Stannard, and

---

discrepancy.

[4]  "AAPDs serve as official sources for the latest updates in acquisition and assistance (A&A) policy and requirements. AAPDs provide information of significance including, but not limited to, advance notification of changes or implementation of

8

other HHS and State Department employees.  Later that day, Stannard and HHS employee Demetrios Kouzoukas sent "a final draft of the language" to Lerner, Gardner, and other HHS, USAID, and State Department employees, and thanked those on the email chain for their comments.  Email from Demetrios Kouzoukas, "Language in HHS HIV/AIDS award instruments," J.A. 48 (Feb. 19, 2004).

One week later, on February 26, 2004, USAID issued an AAPD intended to "provide clauses to be included as new standard provisions for assistance agreements and contracts that include FY 2004 HIV/AIDS funds."  USAID AAPD 04-04 Revised, "Implementation of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003" at 2, J.A. 167 (Feb. 26, 2004) ("February 26 AAPD").  The February 26 AAPD included the pledge requirement only for "Non-U.S. Non-Governmental Organizations and Public International Organizations."  Id. at 5. That meant that any grant to a foreign organization would include

_____

new requirements to A&A regulations and procedures."  Acquisition and Assistance Policy Directives (AAPDs) and Contract Information Bulletins (CIBs), available at http://transition.usaid.gov/business/business_opportunities/cib/ (last visited August 3, 2012).  "Acquisition refers to obtaining goods and services, through various types of contracts, for the use or benefit of the Agency.  Assistance refers to transferring funds (or other valuables) from USAID to another party for the implementation of programs which will contribute to the public good . . . ."  Doing Business with USAID, available at http://transition.usaid.gov/business (last visited August 8, 2012).  No evidence in the record of which we are aware refers to any formal process that might exist for the creation or approval of AAPDs.

a clause explaining that "[a]s a condition of entering into this agreement, the recipient agrees that it has a policy explicitly opposing, in its activities outside the United States, prostitution and sex trafficking." Id. at 6. No similar language would be included in the grant language required with respect to U.S. organizations. An AAPD that had been issued on January 15, 2004, prior to the OLC's February memorandum, did include the pledge requirement language for both U.S. and non-U.S. organizations. USAID AAPD 04-04, "Implementation of the United States Leadership Against HIV/AIDS, Tuberculosis and Malaria Act of 2003" at 3, J.A. 162 (Jan. 15, 2004).

On June 24, 2004, HHS issued a grant proposal that required "any foreign recipient [to] have a policy explicitly opposing, in its activities outside the United States, prostitution and sex trafficking." HHS Funding Announcement, "HIV Treatment for Research Subjects or by Researchers in Kenya" at 7, J.A. 176 (June 24, 2004). A July 22, 2004, USAID document contained a footnote explaining that the OLC "in a draft opinion determined that this provision only may be applied to foreign non-governmental organizations and public international organizations because of the constitutional implications of applying it to U.S. organizations." USAID FY 2004 Update, "Guidance on the Definition and Use of the Child Survival and Health Programs Fund and the Global HIV/AIDS Initiative Account"

10

at 35 n.10, J.A. 197 (July 22, 2004) ("July 22 USAID Update").
On August 3, 2004, USAID issued another AAPD explaining that
"[t]he US Government has determined that it is appropriate to
apply the [pledge] requirement . . . only to foreign
organizations, including public international organizations."
USAID AAPD 04-09, "Anti-Trafficking Activities –– Limitation on
the Use of Funds; Restriction on Organizations Promoting,
Supporting or Advocating Prostitution" at 3, J.A. 200 (Aug. 3,
2004) ("August 3 AAPD").

                    The July Memoranda

          In a July 2, 2004 email, the OLC provided HHS with a
thirty-page draft opinion –– the second document the plaintiff
seeks.  Another version of that draft, dated July 29, the third
document that the plaintiff contends must be disclosed, was
emailed to HHS on July 30.  In the record on appeal, both draft
opinions are redacted with the exception of a date, title, and
introductory sentence.  After an in camera review, however, the
district court concluded that contrary to the OLC's view conveyed
in February, those drafts counseled implementation of the pledge
requirement for both U.S.-based and foreign organizations.[5]

---

[5] Despite the July 2004 memoranda that opined that the
pledge requirement could constitutionally be applied to domestic
activities, in July and August, USAID continued to advise that
the requirement would only be applied to foreign organizations,
as evidenced by the July 22 USAID Update and August 3 AAPD.

11

Brennan Center v. Dep't of Justice, No. 09 Civ. 8756 at 17-18, 2011 WL 4001146, at *7, 2011 U.S. Dist. LEXIS 99121, at *19 (S.D.N.Y. Aug. 30, 2011). No formal OLC opinion on the issue was ever finalized or issued.

In September 2004, Daniel Levin, the Acting Assistant Attorney General for the OLC, wrote to the general counsel of HHS confirming that "earlier this year . . . [DOJ] gave its tentative advice" that the pledge requirement could only be applied to foreign organizations overseas, but explained that "[w]e have reviewed the matter further and we are withdrawing that tentative advice. . . . [T]here are reasonable arguments to support [the domestic pledge requirement's] constitutionality." Letter from Levin to HHS General Counsel Alex M. Azar, II at 1, J.A. 207 (Sept. 20, 2004)("Levin Letter"). This letter was not released by either the OLC or HHS, but, according to the defendants, it was "improperly leaked . . . [and] later made public by members of Congress." Defs.' Br. at 13.

The first public discussion of the agencies' deliberations concerning the pledge requirement was held during a March 2005 hearing of the Foreign Operations Subcommittee of the House Appropriations Committee. Randall Tobias, who was then U.S. Global AIDS coordinator, testified that

> [t]he [OLC] provided some tentative advice
> initially that those restrictions should be
> applied only to foreign organizations.

12

Sometime mid- to late- . . . September of 2004, [the OLC] withdrew that earlier tentative advice and advised that that provision was intended by the Congress to apply without that limitation to both domestic organizations as well as foreign organizations. And so I'm simply following the legislation and the advice to implement that.

Foreign Operations, Export Financing, and Related Programs Subcommittee Hearing Testimony of Randall L. Tobias, J.A. 236 (March 2, 2005)("Tobias Testimony").

In May 2005, HHS announced that it would apply the pledge requirement to domestic organizations, and USAID did the same in June 2005.

In a July 17, 2007, letter from Principal Deputy Assistant Attorney General Brian Benczkowski to Congressman Henry Waxman, Benczkowski further explained the OLC's positions on the pledge requirement. "[I]n February 2004, the [OLC] provided tentative advice [to HHS and USAID] that the [pledge requirement] . . . could, under the Constitution, be applied only to foreign organizations acting overseas." Letter from Brian Benczkowski to Congressman Waxman at 1, J.A. 230 (July 17, 2007)("Benczkowski Letter"). But Benczkowski explained that the OLC had thereafter changed its mind and advised in the September 2004 letter that the pledge requirement could be applied domestically because there were "reasonable arguments to defend" doing so. Id. at 1-2. The letter also noted that the OLC would

not turn over its internal documents on the issue because of "substantial confidentiality interests."[6] Id. at 2.

### The District Court Opinion

The district court considered the foregoing evidence in analyzing the question of whether the agencies had "expressly . . . adopt[ed] or incorporate[d]" the memoranda sufficiently to waive the protection of Exemption 5. Brennan Center, 2011 WL 4001146, at *3, 2011 U.S. Dist. LEXIS 99121, at *8-*9 (quoting La Raza, 411 F.3d at 356); see also discussion of Exemption 5, at Part II of the Discussion section of this opinion, below. In ordering disclosure of the memoranda, the court concluded that the deliberative-process privilege did not apply.

> It is clear from the various AAPDs, internal
> government letters and memoranda, public

---

[6] Several news articles -- at least one of which was published before the agencies themselves had spoken publicly -- also noted the OLC's advice on this issue. A February 28, 2005, Wall Street Journal article explained that "[t]he Bush Administration had previously applied the requirement only to overseas groups because the Justice Department initially advised that it would be an unconstitutional violation of free speech to demand that American grant applicants support Mr. Bush's policy. But the Justice Department reversed itself last fall." Michael M. Phillips, Bush Ties Money for AIDS Work to a Policy Pledge, WALL ST. J., Feb. 28, 2005. A May 18, 2005, Washington Post article similarly said that "[i]nitially, the policy was applied only to foreign organizations operating overseas. U.S.-based charities were exempt because the Justice Department believed that forcing them to make the declaration might infringe their First Amendment right of free speech." David Brown, U.S. Backs Off Stipulation on AIDS Funds, WASH. POST, May 18, 2005.

14

statements made by Government officials, and other materials reviewed by the Court in camera that, between February and September 2004, USAID and HHS adopted as agency policy both the conclusions provided in the February Memo that the Pledge Requirement should be applied to foreign organizations only, as well as OLC's reasoning and analysis that application of the Pledge Requirement to domestic organizations would violate the First Amendment.  Indeed, from the public record alone, there can be little doubt that this was the case. . . .

Further, the record also reveals that the conclusions and analysis contained in the July Memoranda, which the Court has examined in camera, were the basis for the Government's determination to alter its policy and apply the Pledge Requirement to U.S.-based organizations. . . .  [A]lthough the documents were never mentioned specifically by name, the Government incorporated the July Memoranda by reference [in the relevant public statements].

Brennan Center, 2011 WL 4001146, at *6-*7, 2011 U.S. Dist. LEXIS 99121, at *17-*19.

The court also concluded that because the memoranda had been "incorporated . . . into HHS's and USAID's official policy" they were not protected by the attorney-client privilege.  Id. at *7, 2011 U.S. Dist. LEXIS 99121, at *20.  The court therefore granted the plaintiff's motion for summary judgment, denied the defendants' cross-motion for summary judgment, and ordered the disclosure of all three memoranda.

The defendants appeal.

15

**DISCUSSION**

## I.  Standard of Review

"We review <u>de novo</u> a district court's grant of summary judgment in a FOIA case," <u>La Raza</u>, 411 F.3d at 355, as, of course, we review all such motions, <u>see, e.g.</u>, <u>Oneida Indian Nation of N.Y. v. Madison County</u>, 665 F.3d 408, 424 (2d Cir. 2011), and cross motions, for summary judgment, <u>see, e.g.</u>, <u>Terwilliger v. Terwilliger</u>, 206 F.3d 240, 244 (2d Cir. 2000). Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The parties do not dispute that this matter was properly decided on cross motions for summary judgment, although, of course, they differ as to which side should have prevailed.

## II.  Deliberative Process Exemption

<u>A.  Basic Principles</u>.

<u>1.  Generally.</u>

Consistent with its purpose to "promote honest and open government[,] and to assure the existence of an informed citizenry in order to hold the governors accountable to the governed[,] FOIA strongly favors a policy of disclosure."  <u>La Raza</u>, 411 F.3d at 355 (internal quotation marks, alterations, and citations omitted).  It "requires the government to disclose its records unless its documents fall within one of the specific,

16

enumerated exemptions set forth in the Act. Consistent with FOIA's purposes, these statutory exemptions are narrowly construed." Id. at 355-56 (citations omitted). The agency bears the burden of demonstrating that an exemption applies. Id. at 356.

The memoranda being sought by the Brennan Center in this case were withheld by the government defendants pursuant to FOIA Exemption 5, which exempts "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" from the disclosure otherwise required under the Act. 5 U.S.C. § 552(b)(5). The privilege is based "on the policy of protecting the decision making processes of government agencies." NLRB v. Sears, Roebuck, & Co., 421 U.S. 132, 150 (1975) (internal quotation marks omitted). Prior case law examining it "focuses on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Id. (internal quotation marks and alteration omitted).

> "[T]here are enough incentives as it is for playing it safe and listing with the wind," Ackerly v. Ley, 137 U.S. App. D.C. 133, 138, 420 F.2d 1336, 1341 (1969), and as [the Court has] said in an analogous context, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the

17

decisionmaking process."  United States v. Nixon, 418 U.S. 683, 705 (1974) . . . .

Sears, 421 U.S. at 150-51 (emphasis omitted; second alteration in original); see also Wolfe v. Dep't of Health & Human Servs., 839 F.2d 768, 773 (D.C. Cir. 1988)(en banc)("Congress adopted Exemption 5 because it recognized that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl.").

"An inter- or intra-agency document may be withheld pursuant to the deliberative process privilege [i.e., section 552(b)(5)] if it is: (1) 'predecisional,' i.e., 'prepared in order to assist an agency decisionmaker in arriving at his decision,' and (2) 'deliberative,' i.e., 'actually . . . related to the process by which policies are formulated.'"  La Raza, 411 F.3d at 356 (quoting Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999)); see also Grand Cent. P'ship, 166 F.3d at 482 ("The privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." (internal quotation marks omitted)).

However, even if the documents at issue are "predecisional" and "deliberative," and thereby fall under the scope of Exemption 5, there are circumstances under which they will be found outside the scope of that protection.  As discussed

18

more thoroughly below, these exceptions include: (1) when the contents of the document have been "adopted, formally or informally, as the agency position on an issue or [are] used by the agency in its dealings with the public," La Raza, 411 F.3d at 356-57 (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)); and (2) when the document is more properly characterized as an "opinion[] [or] interpretation[] which embod[ies] the agency's effective law and policy," in other words, its "working law," Sears, 421 U.S. at 153 (internal quotation marks omitted).

In short, the document claimed to be exempt will be found outside Exemption 5 if it closely resembles that which FOIA affirmatively requires to be disclosed: "final opinions . . . made in the adjudication of cases," "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register," and "administrative staff manuals and instructions to staff that affect a member of the public." 5 U.S.C. § 552(a)(2)(A)-(C).[7]

2. The Scope of Exemption 5. Although Exemption 5 is set out by statute, it is the Supreme Court's decision in Sears

_____

[7] The litigation posture of Exemption 5 cases, the present one being no exception, focuses on the government proving the applicability of an exemption rather than the plaintiff proving applicability of one of the affirmative provisions because the burden rests on the government to shield documents from disclosure otherwise to be disclosed under FOIA.

that delineates the limits of that exemption, and which has been the starting point for all of our discussions of it, as it is in this case.

The Sears Court explained the circumstances under which a document otherwise subject to Exemption 5 might lose its protection. The plaintiff had submitted a FOIA request for "Advice and Appeals Memoranda" prepared by the General Counsel of the National Labor Relations Board ("NLRB") discussing potential charges against various employers. 421 U.S. at 142-43.

The Court began by analyzing the process by which such memoranda were created. Typically, the NLRB General Counsel required certain charging decisions from its regional offices first to be submitted to its central office so that the agency had an "opportunity to formulate a coherent policy, and to achieve some measure of uniformity, in enforcing the labor laws." Id. at 141. A regional director submitted a memorandum that "set[] forth the facts of the case, a statement of the issues on which advice [was] sought, and a recommendation." Id. The General Counsel's office then assigned the case to a staff attorney who assisted in preparing the "Advice and Appeals Memorandum" that "briefly summarize[d] the facts, . . . set forth the . . . legal or policy issue submitted together with a detailed legal rationale, and contain[ed] instructions for the final processing of the case." Id. at 142 (internal quotation

20

marks omitted). Based on that memorandum, the regional director then decided whether or not to prosecute the charge. Id.

The Court observed that while "the public is vitally concerned with the reasons . . . [for] an agency policy actually adopted," or "those communications which explain [a] decision," "[t]he public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground." Id. at 152.

The reasons for a decision made by an agency, or a policy actually adopted, however, "constitute the 'working law' of the agency." Id. at 153. Therefore, the exemption "properly construed, calls for 'disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" Id. (quoting Kenneth Culp Davis, The Information Act: A Preliminary Analysis, 34 U. Chi. L. Rev. 761, 797 (1967)) (some internal quotation marks omitted). "This conclusion is powerfully supported by . . . [t]he affirmative portion of the Act, [which] expressly requir[es] indexing of 'final opinions,' 'statements of policy and interpretations which have been adopted by the agency,' and

21

'instructions to staff that affect a member of the public.'"[8] Sears, 421 U.S. at 153 (quoting 5 U.S.C. § 552(a)(2)). Those affirmative provisions, it reasoned, "represent[] a strong congressional aversion to secret agency law, and represent[] an affirmative congressional purpose to require disclosure of documents which have the force and effect of law." Id. (internal quotation marks, alterations, and citations omitted).

The Court concluded that NLRB memoranda that advised no action be taken, and thereby ended the inquiry and left the responsible regional director with "no decision to make," fell outside of Exemption 5 and therefore had to be disclosed. Id. at 155. They "are precisely the kind of agency law in which the public is so vitally interested and which Congress sought to prevent the agency from keeping secret." Id. at 156.

After determining that these memoranda were the type of "agency law" which it concluded were non-exempt, the Court then explained that "[f]or essentially the same reasons, these memoranda are 'final opinions' made in the 'adjudication of

---

[8] The Sears Court subsumed into its "working law" or "agency law" analysis all three of section 552(a)(2)'s affirmative provisions, and did not, for example, discuss "final opinions" separately from "statements of policy and interpretations which have been adopted by the agency." In many cases, as in Sears, the line between a "final opinion" and a "statement of policy and interpretation[]" is blurry, and the "working law" analysis therefore provides an interpretation aimed at aiding courts when presented with documents that fall between these categories.

22

cases' . . . pursuant to 5 U.S.C. § 552(a)(2)(A)," and thus must be disclosed.  Id. at 158.  By contrast, the reasoning and conclusions behind memoranda that advise prosecution "will come out in the course of litigation before the Board; and . . . the 'law' with respect to these cases will ultimately be made not by the General Counsel but by the Board or the courts."  Id. at 160.

The Court then addressed a separate path towards the loss of Exemption 5's protection -- whether predecisional and deliberative documents fall outside of that exemption if "adopt[ed] or incorporate[d] by reference" into "what would otherwise be a final opinion," in other words, in a document that has already been found to be nonexempt.  The Court concluded that they did.

> The probability that an agency employee will
> be inhibited from freely advising a
> decisionmaker for fear that his advice if
> adopted, will become public is slight.
> First, when adopted, the reasoning becomes
> that of the agency and becomes its
> responsibility to defend.  Second, agency
> employees will generally be encouraged rather
> than discouraged by public knowledge that
> their policy suggestions have been adopted by
> the agency.  Moreover, the public interest in
> knowing the reasons for a policy actually
> adopted by an agency supports . . . [the
> decision to order disclosure].  Thus, we hold
> that, if an agency chooses expressly to adopt
> or incorporate by reference an intra-agency
> memorandum previously covered by Exemption 5
> in what would otherwise be a final opinion,
> that memorandum may be withheld only on the
> ground that it falls within the coverage of
> some exemption other than Exemption 5.

23

Id. at 161 (emphasis in original).

On the same day that the Supreme Court decided Sears, it also decided Renegotiation Board v. Grumman Aircraft Engineering Corp., 421 U.S. 168 (1975), a companion case further exploring the limits of Exemption 5. Grumman had requested documents created during the Renegotiation Board's process of "deciding whether certain Government contractors have earned, and must refund, 'excessive profits' on their Government contracts." Id. at 170. After exhaustively reviewing the process by which these documents were created, the Court explained that if a "Division Report" was created recommending a course of action, it would be given to the Renegotiation Board for its review. Id. at 176-77. But "[n]either the Board nor any of its members were bound by any prior recommendations. The Board was free, after discussion, to reject the proposed conclusion reached in the Division Report, or to accept it for reasons other than those set forth in the report." Id. at 177. Similarly, although under a different process, a "Regional Board Report" could be created. Id. at 178-79.

The Court concluded that these reports were not subject to disclosure because "the evidence utterly fails to support the conclusion that the reasoning in the reports is adopted by the Board as its reasoning, even when it agrees with the conclusion of a report." Id. at 184 (emphasis in original). The reports themselves had "no operative effect," and therefore could not be

24

characterized as "final opinions," within the meaning of FOIA's affirmative disclosure provisions. Id. at 187. "[A]bsent indication that [a report's] reasoning has been adopted, there is little public interest in [its] disclosure." Id. at 186. The reports therefore retained their protection under Exemption 5.

The Grumman Court acknowledged that some agency decisions may simply not have any accompanying public rationale. "The effect of this decision [then] is that, in those cases in which [the Renegotiation Board does not offer a summary of its reasoning], the public will be largely uninformed as to the basis for [its] decisions." Id. at 191.

> The Freedom of Information Act imposes no independent obligation on agencies to write opinions. It simply requires them to disclose the opinions which they do write. If the public interest suffers by reason of the failure of the Board to explain some of its decisions, the remedy is for Congress to require it to do so. It is not for us to require disclosure of documents, under the purported authority of the Act, which are not final opinions, which do not accurately set forth the reasons for the Board's decisions, and the disclosure of which would impinge on the Board's predecisional processes.

Id. (citation omitted).

Although Grumman did not explain its reasoning using the same terminology as Sears, it also provided two somewhat distinct paths through which Exemption 5's protections could be lost: (1) if the reports had "operative effect" and were therefore akin to "final opinions" –- the equivalent of "working

25

law" in Sears's language; or (2) if the reports' reasoning and conclusions had been adopted by the Board in issuing its own decision -- the equivalent of "express adoption or incorporation by reference" in Sears.

3. Express Adoption or Incorporation by Reference. We have had several occasions on which to apply the Supreme Court's Exemption 5 jurisprudence, in particular Sears's "express adoption" or "incorporation by reference" holding, on which the district court relied. The most relevant for present purposes was our decision in La Raza. There we considered whether the FOIA required disclosure of an OLC memorandum prepared for the DOJ on the subject of whether state and local law enforcement officials could lawfully enforce certain provisions of federal immigration law. La Raza, 411 F.3d at 352. The DOJ argued that "it did not expressly adopt or incorporate the OLC memorandum" into a final opinion, and it was therefore protected by the deliberative-process exemption, or the attorney-client privilege. Id.

Since 1996, the DOJ had been of the view that state and local law enforcement could not enforce the civil provisions of federal immigration law -- "such as overstaying one's visa or entering the United States without proper documentation." Id. at 352-53 & n.1. The OLC had issued a memorandum supporting this position, which it had released publicly. Id. at 353.

26

In 2002, under a new presidential administration, the DOJ changed its policy. Id. Then-Attorney General John Ashcroft announced an immigration initiative employing state and local agencies to enforce specified civil provisions of federal immigration law. In a June 5, 2002, press conference explaining the new initiative, the Attorney General reported that "[OLC] has concluded that this narrow, limited mission we are asking state and local police to undertake voluntarily -- arresting aliens who have violated . . . civil provisions that render an alien deportable [--] is within the inherent authority of the states." Id.

On March 11, 2003, General Ashcroft wrote a letter to an organization that had expressed an interest in the matter explaining that "[OLC] previously opined that state and local law enforcement officials have inherent authority to make arrests for criminal immigration law violations generally." Id. At least three other letters from the Attorney General and an Acting Assistant Attorney General containing similar language were submitted to members of Congress. Id. at 354. And in June 2003, another member of the Attorney General's office, speaking to a group of local and state police department officials who were part of an FBI advisory board, offered a detailed explanation of the policy in which he repeatedly referenced the OLC's advice. Id. at 354-55.

27

We concluded that the "repeated references" made by the Attorney General and high-ranking DOJ officials to the document "demonstrate[d] that the Department regarded the [m]emorandum as the exclusive statement of, and justification for, its new policy . . . ." Id. at 357. The DOJ thus "made a practice of using the OLC Memorandum to justify and explain the Department's policy and to assure the public and the very state and local government officials who would be asked to implement the new policy that the policy was legally sound." Id. at 358. The memorandum was, indeed, the "primary legal authority justifying and driving" the change in policy.[9] Id.

We thus concluded that the document had been expressly adopted or incorporated by reference, and ordered it to be released. Id.

Our decision in Wood v. FBI, 432 F.3d 78 (2d Cir. 2005), rested on a rationale similar to that employed by the Supreme Court in Grumman. There, a reporter sought disclosure of a memorandum prepared by DOJ trial attorneys related to an investigation of FBI agents alleged to have lied in affidavits supporting arrest warrant applications. Id. at 80. We affirmed

---

[9] Referring to Grumman, we noted that "there must be evidence that an agency has actually adopted or incorporated by reference the document at issue; mere speculation will not suffice." La Raza, 411 F.3d at 359 (emphasis in original). We also observed that "a casual reference to a privileged document does not necessarily imply that an agency agrees with the reasoning contained in those documents." Id.

the district court's conclusion that the memorandum was properly withheld under the work-product privilege pursuant to Exemption 5,[10] and had not been incorporated by reference or expressly adopted by the agency.  Id. at 84.

The plaintiff had argued that a note on the memorandum by a high-ranking DOJ official indicating that he would decline prosecution constituted express adoption or incorporation by reference of the memorandum itself.  But, we said:

> This brief notation does not indicate that DOJ adopted the reasoning of the . . . [m]emo.  Neither [the endorsing official] nor any other high-level DOJ officials made any public references to the . . . [m]emo.  There is no evidence in the record from which it could be inferred that DOJ adopted the reasoning of the [m]emo, and, as we explained in . . . La Raza, this failure is fatal.

Id. at 84.[11]

---

[10]  The court did "not reach the question of whether [the La Raza] doctrine would require the disclosure of otherwise exempt attorney work-product," as opposed to documents exempt under the deliberative process exemption.  Wood, 432 F.3d at 84.

[11] Shermco Industries Inc. v. Secretary of Air Force, 613 F.2d 1314 (5th Cir. 1980) is similar.  The court reversed a district court's conclusion that a memorandum discussing a bid award, which had been forwarded to the GAO as part of bid protest proceedings, lost its deliberative character.  Id. at 1320. First, the court noted that "the decision [on to whom to award the bid] was not yet final."  Id. at 1319.  Second, "even if it were a final decision, these memoranda were not expressly incorporated by reference into the [final decision by the Air Force to award the contract].  They had been used by the Air Force internally in reaching their initial conclusion that [a Shermco competitor] was the lowest bidder, and they were produced to the GAO in aid of their defense against Shermco's protest, but they were never attached to any formal written decision by the Air Force."  Id. at 1320.

4.  The "Working Law" Principle.  While our previous cases and the proceedings thus far in this one have largely focused on the issue of whether a memorandum has been expressly adopted or incorporated by reference, Sears also requires us to ask whether the OLC opinion constitutes the "working law of the agency" and therefore must be disclosed.

If an agency's memorandum or other document has become its "effective law and policy," it will be subject to disclosure as the "working law" of the agency, Sears, 421 U.S. at 153, much the same as it would be if expressly adopted or incorporated by reference into a nonexempt document, id. at 161-62.  The Sears Court explained that the purposes undergirding FOIA required disclosure in either instance.  Compare id. at 152 (explaining that "working law" should be disclosed because "the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted"), with id. at 161 (explaining that documents expressly adopted or incorporated should be disclosed in part because of "the public interest in knowing the reasons for a policy actually adopted by an agency").  As explained above, the "working law" analysis is animated by the affirmative provisions of FOIA, see 5 U.S.C. § 552(a)(2)(A)-(C), and documents must be disclosed if more akin to that which is required by the Act to be disclosed than that which may be

30

withheld under Exemption 5. Sears separately analyzed each of these two means by which Exemption 5 protection may be lost.[12]

Not surprisingly given the nature of much of its caseload, the D.C. Circuit has become something of a specialist in the "working law" exception. The circuit analyzed it at some length in Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854 (D.C. Cir. 1980). There, the plaintiff sought copies of Department of Energy interpretations of its regulations, specifically "memoranda from regional counsel to auditors working in [the Department of Energy ("DOE")]'s field offices, issued in response to requests for interpretations of regulations within the context of particular facts encountered while conducting an audit of a firm." Id. at 858. The agency argued against disclosure, contending that the memoranda were not binding on the

---

[12] The Eleventh Circuit is one of the few courts to have examined the link between these two elements of Sears.

> [D]ata "expressly adopt[ed] or incorporate[d] by reference" means predecisional deliberative material which is adopted and approved by the agency as its "effective law and policy." By expressly adopting the reasoning of her subordinate, the decisionmaker has in effect converted a rejected proposal into the rationale for the agency's working law. As a consequence, the documents are no longer considered predecisional[,] for they now support and explain the agency's position in the same manner a postdecisional document explains an agency decision.

Fla. House of Representatives v. Dep't of Commerce, 961 F.2d 941, 945 n.4 (11th Cir.) (citation omitted), cert. dismissed, 506 U.S. 969 (1992).

audit staff -- the staff was free to disregard the conclusions reached in those memoranda. Id. at 859. The court disagreed. It noted that the memoranda were "at times 'amended' or 'rescinded,' which would hardly be necessary if the documents contained merely informal suggestions to staff which could be disregarded . . . ." Id. at 860.

After examining the particular role that the documents played in the audit process, the court concluded that they

> were not suggestions or recommendations as to what agency policy should be. . . . [T]he memoranda are not advice to a superior, nor are they suggested dispositions of a case, as in Grumman. They are not one step of an established adjudicatory process, which would result in a formal opinion, as were the documents held exempt in [Sears].

Id. at 868.

> [T]hese opinions were routinely used by agency staff as guidance in conducting their audits, and were retained and referred to as precedent. If this occurs, the agency has promulgated a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label. This we will not permit the agency to do. Tentative opinions are not relied on as precedent; they are considered further by the decisionmaker.

Id. at 869.[13]

---

[13] In Coastal States, there was no allegation by the plaintiff that the memoranda had been expressly adopted or incorporated by reference, suggesting that in some cases disclosure is required even without public reliance on a document otherwise exempt from disclosure under Exemption 5.

In *Public Citizen, Inc. v. Office of Management and Budget*, 598 F.3d 865 (D.C. Cir. 2010), the court considered the plaintiff's request for documents created by the White House Office of Management and Budget ("OMB") describing the circumstances under which an agency might "bypass" OMB and submit their budget materials directly to Congress. *Id.* at 867. The documents at issue "summariz[ed]" OMB's understanding of which agencies had such bypass authority and the bases for that authority. *Id.* at 868. The court concluded that the documents did not enjoy the protection of Exemption 5 because "[d]ocuments reflecting OMB's formal or informal policy on how it carries out its responsibilities fit comfortably within the working law framework." *Id.* at 875. As in *Coastal States*, the documents were referred to as precedent, and not part of an ongoing deliberative process.

Similarly, in *Tax Analysts v. IRS*, 294 F.3d 71 (D.C. Cir. 2002), the court ordered release of IRS documents explaining whether certain tax exemptions applied to specific taxpayers, concluding that they constituted "working law" because their "tone . . . indicate[d] that they simply explain[ed] and appl[ied] established policy." *Id.* at 80-81 (internal quotation marks omitted). Those documents included the phrases "It is the position of the Treasury Department that" and "We conclude," while the exempt documents contained "such phrases as 'We

33

believe' and 'We suggest.'" Id. at 81. To qualify as working law, "[i]t is not necessary that the [documents] reflect the final programmatic decisions of the program officers who request them. It is enough that they represent [the Office of the Comptroller of the Currency]'s final legal position concerning the Internal Revenue Code, tax exemptions, and proper procedures." Id. (emphasis in original).

Our Court has relatively little case law examining the "working law" principle. In La Raza, we made passing reference to Sears's conclusion that the public was "vitally concerned" with the reasons for a policy actually adopted, and that these reasons constituted the "working law" of the agency. 411 F.3d 360. We did so, however, in the context of explaining the relevance of the public adoption of the OLC memorandum at issue to the question of whether it should be disclosed, noting that "the public can only be enlightened by knowing what the [agency] believes the law to be." Id. (quoting Tax Analysts v. IRS, 117 F.3d 607, 618 (D.C. Cir. 1997)). In that context, we agreed with the district court's conclusion that "[t]he Department's view that it may adopt a legal position while shielding from public view the analysis that yielded that position is offensive to FOIA." Id. (internal quotation marks omitted).

The question of whether a document constitutes "working law," or has been expressly adopted or incorporated by reference,

34

then, are two paths to determining whether a withheld document constitutes what FOIA affirmatively requires to be disclosed -- "'final opinions,' 'statements of policy and interpretations which have been adopted by the agency,' and 'instructions to staff that affect a member of the public.'" Sears, 421 U.S. at 153 (quoting 5 U.S.C. § 552(a)(2)). Most Exemption 5 cases are not framed in this manner because it is the government's burden to prove that the privilege applies, and not the plaintiff's to demonstrate the documents sought fall within one of the enumerated section 552(a)(2) categories. Nevertheless, the appropriate analysis requires us to determine whether the documents sought more closely resemble the type of internal deliberative and predecisional documents that Exemption 5 allows to be withheld, or the types of documents that section 552(a)(2) requires be disclosed. To do that, the Supreme Court and our court have asked whether the documents fit within the description of "working law," in addition to whether they have been expressly adopted or incorporated by reference into a nonexempt communication.

B. Analysis

1. The February 2004 Memorandum. We begin our analysis of the status of this document, as we must with respect to all three memoranda at issue, by examining the process by which the memorandum was created. See Tique v. Dep't of Justice,

35

312 F.3d 70, 78 (2d Cir. 2002) ("[W]hether a particular document is exempt . . . depends not only on the intrinsic character of the document itself, but also on the role it played in the administrative process.") (internal quotation marks omitted), cert. denied, 538 U.S. 1056 (2003).  We do so because "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy . . . ."  Sears, 421 U.S. at 153 (internal quotation marks omitted).

The emails in the record indicate that USAID and HHS officials asked the OLC for advice on the constitutional and legal propriety of the implementation of the pledge requirement. They then incorporated that advice into their decision as to whether the language of the grants for HIV/AIDS and anti-trafficking work would in fact require "an explicit and affirmative policy opposing prostitution."  It also appears that the OLC reviewed USAID's proposed grant language before the AAPD that contained it was issued.

It is not disputed that the February 2004 memorandum was predecisional and deliberative.  See Public Citizen, 598 F.3d at 874 ("We deem a document predecisional if it was generated before the adoption of an agency policy and deliberative if it reflects the give-and-take of the consultative process.") (internal quotation marks omitted).

> [A]n agency may meet its burden of proof under the 'predecisional document' test by demonstrating that the preparer was not the final decisionmaker and that the contents confirm that the document was originated to facilitate an identifiable final agency decision. . . . A predecisional document will qualify as 'deliberative' provided it . . . formed an essential link in a specified consultative process, . . . reflects the personal opinions of the writer rather than the policy of the agency, and . . . if released, would inaccurately reflect or prematurely disclose the views of the agency.

Providence Journal Co. v. Dep't of the Army, 981 F.2d 552, 559 (1st Cir. 1992) (citations, internal quotation marks, and brackets omitted).

The "decision" being made by USAID and HHS was whether they were constitutionally bound to disregard a duly enacted statute's command that domestic organizations be subject to the pledge requirement. Although this may not properly be referred to as an "adjudication," it was a firm and concrete decision regarding the agency's policy.[14] See Cmty. Television of S.

---

[14] In this sense, the "decision" made differs from one in which an agency considers and rejects a policy that it was never required to consider or implement. In Common Cause v. IRS, 646 F.2d 656 (D.C. Cir. 1981), the court considered whether documents related to the IRS's decision not to implement a plan it had proposed, which would have disclosed "the names of federal officials who had approached the IRS about the tax matters of third parties, as well as the subjects of such contacts," should have been released per FOIA. Id. at 658. The court rejected the plaintiffs' argument that the documents "constitute[d] the reasons which suppl[ied] the basis for the agency policy actually adopted." Id. at 659. "The proposed disclosure plan remained

37

Cal. v. Gottfried, 459 U.S. 498, 515-516 (1983) ("[H]owever broad an administrative agency's discretion in implementing a regulatory scheme may be, the agency may not ignore a relevant Act of Congress. . . . [T]he agency cannot simply 'close its eyes' to the existence of the statute." (citation omitted)); Lincoln v. Vigil, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities . . . ."); see also Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. O.L.C. 199, 200 (1994) (explaining the president's ability to decline to enforce statutes he views as unconstitutional); Bristol-Meyers Co. v. FTC, 598 F.2d 18, 25 (D.C. Cir. 1978) (concluding that an agency's decision not to proceed with rulemaking is analogous to

---

just that. Its rejection did not, therefore, constitute the making of law or policy by an agency. The exchange of ideas and proposals which took place within the Service with respect to the proposed plan is precisely the type of communication which Congress meant to protect in enacting Exemption 5." Id. The court considered and rejected the argument that the memoranda should be disclosed because they contained the "written reasons for the agency's final decision not to implement the proposed plan." Id. "This case differs from Sears in many important respects. The present case involves the voluntary suggestion, evaluation, and rejection of a proposed policy by an agency, not the agency's final, unappealable decision not to pursue a judicial remedy in an adversarial dispute . . . . No statute demands that the IRS voluntarily disclose information about third-party contacts . . . ." Id. at 659-60. The court also considered the broader implications of the plaintiffs' argument, concluding that it would "virtually eliminate the governmental privilege" as "[e]very rejection of a proposal, no matter how infeasible or insignificant, would become a 'final decision' of an agency." Id. at 660.

the NLRB's non-charging decision in Sears, and thus would not enjoy the protection of Exemption 5). We find no other evidence concerning this decisionmaking process in the record.

No one at the OLC made the decision that the pledge requirement as it pertained to domestic organizations would not be implemented. As Paul Colborn, special counsel to the OLC, explained to the district court by affidavit, "OLC does not purport, and in fact lacks authority, to make policy decisions. OLC's legal advice and analysis informs the decisionmaking of Executive Branch officials on matters of policy, but OLC's legal advice is not itself dispositive as to any policy adopted." Decl. of Paul P. Colborn at 2, J.A. 318 (March 11, 2011). The plaintiff does not submit contrary evidence suggesting that the OLC's recommendation was effectively binding on the agency, as in Coastal States, 617 F.2d at 869, or left it with "no decision to make," as in Sears, 421 U.S. at 155. The February Memorandum does not constitute "working law," or "the agency's effective law and policy." Id. at 153. We nonetheless conclude that the OLC's views were adopted by reference by USAID in nonexempt communications, and therefore must be disclosed.

The first explicit reference to the OLC advice came in a July 22, 2004, USAID document entitled "Guidance on the Definition and Use of the Child Survival and Health Programs Fund and the Global HIV/AIDS Initiative Account." There the agency

39

explained that the funding statute "requires non-U.S. non-governmental organizations . . . receiving HIV/AIDS funds to agree that they have a policy explicitly opposing, in their activities outside of the United States, prostitution and sex trafficking." July 22 USAID Update at 35. In a footnote, the document explained that "[t]he Office of Legal Counsel, U.S. Department of Justice in a draft opinion determined that this provision only may be applied to foreign non-governmental organizations and public international organizations because of the constitutional implications of applying it to U.S. organizations." Id. at 35 n.10.[15]

Then, in March 2005, after HHS and USAID had shifted their positions, tentatively deciding to apply the pledge requirement domestically, Randall Tobias, the USAID Global AID

---

[15] Plaintiff urges us also to consider the September 20, 2004, letter from an OLC official to the general counsel of HHS explaining that the "tentative advice" offered earlier was being "withdraw[n]." Levin Letter at 1-2. Because there were "reasonable arguments" to support the constitutionality of the policy, the OLC official stated, "we believe that HHS may implement these provisions." Id. at 1. Because this letter was neither written by a decisionmaker nor released publicly by the decisionmaking agency, its relevance is limited. It does not aid in establishing either express adoption or incorporation by reference, and neither does it suggest that the February 2004 OLC opinion was considered the "working law" of the agency. Rather, it suggests that even after the February memorandum was sent to HHS, a deliberative process continued, and advice was later offered again to HHS that was also non-binding. In this sense, it supports the defendant's contention that the February memorandum should have been considered exempt from disclosure.

Administrator, made a second reference to the February Memorandum. When asked in a Congressional hearing about the agency's change in positions, he explained:

> The [OLC] . . . provided some tentative advice initially that those restrictions should be applied only to foreign organizations. Sometime mid- to late-, I think, in September of 2004, they withdrew that earlier tentative advice and advised that that provision was intended by the Congress to apply without that limitation to both domestic organizations as well as foreign organizations. And so I'm simply following the legislation and the advice to implement that.

Tobias Testimony, J.A. 236.[16]

Thus, there were two public statements referencing the February 2004 memorandum -- the July 22 footnote, and the Tobias testimony. We conclude that these references taken together establish express adoption or incorporation by reference.

---

[16] An additional "public" reference was made to the February 2004 memorandum, in a July 2007 letter from an OLC official to Congressman Henry Waxman. Waxman had requested an explanation from the OLC regarding its interpretation of the pledge requirement. The OLC wrote that in February 2004 it had provided "tentative advice" to HHS and USAID that the pledge requirement "could, under the Constitution, be applied only to foreign organizations acting overseas." Benczkowski Letter at 1. The letter then went on to explain the subsequent change in advice. This letter is also of limited relevance in determining whether or not the February 2004 opinion should be subject to disclosure because it was not authored by a decisionmaker from USAID or HHS. (Again, this would be different had plaintiff adduced evidence that OLC opinions were essentially binding upon the agencies.)

To be sure, neither the July 22 footnote nor Tobias's testimony discussed at length the rationale provided by the OLC for its conclusion as to the propriety of applying the pledge requirement to domestic grantees. Noting that the advice itself was limited to one page in the first instance, we conclude that the July 22 footnote's explanation that the pledge requirement would not be enforced "because of the constitutional implications of applying it to U.S. organizations," July 22 USAID Update at 35 n.10, at least when reenforced by the Tobias reference, demonstrates sufficient reliance on both the conclusion and reasoning of the OLC memorandum to remove the protection of the deliberative-process exemption.[17]

---

[17] In a pre-Sears case, the D.C. Circuit ordered disclosure pursuant to Exemption 5 based on reasoning similar to what we apply here.

> We do not feel that [the agency] should be required to 'operate in a fishbowl,' but by the same token we do not feel that [the party seeking disclosure] should be required to operate in a darkroom. If the [agency] did not want to expose its staff's memorandum to public scrutiny it should not have stated publicly in its April 11 ruling that its action was based upon that memorandum, giving no other reasons or basis for its action. When it chose this course of action 'as a matter of convenience' the memorandum lost its intra-agency status and became a public record, one which must be disclosed . . . .

Am. Mail Line, Ltd. v. Gulick, 411 F.2d 696, 703 (D.C. Cir. 1969) (citation omitted).

Any agency faces a political or public relations calculation in deciding whether or not to reference what might otherwise be a protected document in explaining the course of action it has decided to take. In many cases, as here, the agency is not required to explain its reasons publicly. Nonetheless, where it determines there is an advantage to doing so by referencing a protected document as authoritative, it cannot then shield the authority upon which it relies from disclosure.

2. The July 2004 Memos. As outlined above, on July 2, 2004, OLC lawyer Lerner sent an email to HHS and USAID officials attaching a 30-page draft memorandum with the statement, "Any comments you have would be much appreciated." Email from Lerner, "OLC draft opinion on Sex Trafficking, AIDS Act grant restrictions." J.A. 92 (July 2, 2004). On July 30, 2004, another OLC lawyer sent an updated draft of the memorandum to the HHS general counsel.

On September 20, 2004, an OLC official explained in response to the original February inquiry from USAID and HHS as to the constitutionality of the pledge requirement that "we believe that HHS may implement these provisions. If the provisions are challenged in court, the Department stands ready to defend their constitutionality, in accordance with its longstanding practice of defending congressional enactments under

43

such circumstances."  Levin Letter at 1-2 (footnotes omitted).  That letter made no reference to the July OLC memos.  It offered only sparse explanation of the legal basis for OLC's conclusion that the pledge requirement could be defended.  Id.

On May 3, 2005, HHS issued a new policy outlining its updated "funding restrictions," which explained that "any recipient must have a policy explicitly opposing prostitution and sex trafficking."  HHS Funding Announcement, "Increasing Access to HIV Counseling and Testing (VCT) and Enhancing HIV/AIDS Communications, Prevention, and Care in Botswana, Lesotho, South Africa, Swaziland and Cote d'Ivoire" at 10, J.A. 218 (May 3, 2005).  The document does not explain the basis for that policy, nor refer to it as a change in policy.

On June 9, 2005, USAID issued an updated AAPD that required domestic grantees to "have a policy explicitly opposing prostitution and sex trafficking."  USAID AAPD 05-04, "Implementation of the United States Leadership against HIV/AIDS Tuberculosis and Malaria Act of 2003 - Eligibility Limitation on the Use of Funds and Opposition to Prostitution and Sex Trafficking" at 5, J.A. 225 (June 9, 2005).

In this AAPD, USAID did state that "[c]onsistent with guidance from the U.S. Department of Justice," USAID would "now apply [the pledge requirement] to U.S. organizations as well as foreign organizations."  June 2005 AAPD at 2, J.A. 223.  Such

44

reference to guidance from the DOJ does not, however, indicate that USAID (or HHS) adopted the reasoning of the July memoranda. Nor does the fact that the agencies acted in conformity with the July memoranda establish that the agencies adopted their reasoning. Grumman, 421 U.S. at 184. "Mere reliance of a document's conclusions does not necessarily involve reliance on a document's analysis: both will ordinarily be needed before a court may properly find adoption or incorporation by reference." La Raza, 411 F.3d at 358.

When Tobias testified before Congress that USAID had changed its policy, he explained that the OLC's tentative advice had been withdrawn in mid- to late-September 2004. See Tobias Testimony, J.A. 236. That appears to be a reference to the September 2004 OLC letter, not to either of the July 2004 draft memoranda.

On the record before us, then, Tobias's testimony referenced the September 2004 letter. The lack of any specific reference to the July 2004 memoranda by either USAID or HHS are further indications that the July memoranda were in fact parts of the predecisional and deliberative process that yielded the September 2004 letter.

The July 2007 letter to Congressman Waxman also explained the change in policy solely by reference to the September 2004 letter. Although the July 2007 letter was not

45

written by a decisionmaker and therefore could not have served as a basis for express adoption or incorporation by reference, it serves as evidence that it was the September 2004 letter, and not the July 2004 draft memoranda, that led to HHS and USAID's decisions to implement the pledge requirement with respect to U.S.-based organizations.

In sum, there is no evidence that the USAID or HHS based its change in policy on the draft memoranda it seeks. We therefore cannot conclude, as did the district court, that either agency expressly adopted or incorporated by reference these drafts in explaining their policy change. In such a circumstance, ordering release of these never-finalized memoranda would fail to "safeguard and promote agency decisionmaking processes" by, for example, not "protect[ing] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action," and failing to "assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism . . . ." Providence Journal, 981 F.2d at 557 (quoting Coastal States, 617 F.2d at 866); see also Grumman, 421 U.S. at 184-85 ("[If] the evidence utterly fails to support the conclusion that the

46

reasoning in the reports is adopted by the Board as its reasoning, even when it agrees with the conclusion of a report, . . . the reports are not final opinions and do fall within Exemption 5.").

We conclude that the district court erred in ordering disclosure of the July memoranda because there is insufficient evidence that those memoranda were expressly adopted or incorporated by reference by USAID, or became the "working law" of the agency, sufficient to remove the deliberative-process protection.

### III. Attorney-Client Privilege

The defendants argue that even if the February 2004 memorandum is otherwise subject to disclosure, it is protected from such disclosure by the attorney-client privilege, Defs.' Br. at 51-52, which is encompassed by Exemption 5, La Raza, 411 F.3d at 360.[18]  "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are

---

[18]  In its reply brief, the defendants for the first time argue that the plaintiff has waived its argument that the February 2004 document is not protected by the attorney-client privilege because the argument was not raised below. Defs.' Reply at 20-21.  A review of the plaintiff's motion for summary judgment establishes otherwise.  See Mem. in Supp. of Pl.'s Mot. for Summ. J., Brennan Center v. DOJ, No. 09 Civ. 8756, at 17-19 (S.D.N.Y. Jan. 28, 2011), ECF No. 21.  Indeed, the district court considered this argument, concluding that the defendants' argument that the attorney-client privilege protected that document from disclosure "must fail."

intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." United States v. Mejia, 655 F.3d 126, 132 (2d Cir.), cert. denied, 132 S. Ct. 553 (2011).  "[T]he attorney-client privilege protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal advice."  In re County of Erie, 473 F.3d 413, 418 (2d Cir. 2007).

In La Raza, we explained that "[l]ike the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy."  411 F.3d at 360.  The reasons underlying the absence of Exemption 5 protection for such a document otherwise covered by the deliberative-process exemption also underlie the agency's loss of the protection of the attorney-client privilege.

> [O]nce an agency adopts or incorporates [a]
> document, frank communication will not be
> inhibited.  Indeed, once an attorney's (or
> employee's) recommendation becomes agency
> law, the agency is then responsible for
> defending that policy, and the attorney (or
> employee) 'will generally be encouraged
> rather than discouraged' by public knowledge
> that their policy suggestions or legal
> analysis have been adopted by the agency."

Id. (quoting Sears, 421 U.S. at 161).  As we explained, "We cannot allow the Department to make public use of the Memorandum

48

when it serves the Department's ends but claim the attorney-client privilege when it does not."  Id. at 361.

As with respect to the lawyer-client privilege in other contexts, "it is vital to [such] a claim . . . that the communications between client and attorney were made in confidence and have been maintained in confidence."  Mejia, 655 F.3d at 134 (quoting In re Horowitz, 482 F.2d 72, 81-82 (2d Cir. 1973)).  And "[c]ourts have found waiver by implication when a client testifies concerning portions of the attorney-client communication, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense . . . . "  In re County of Erie, 546 F.3d 222, 228 (2d Cir. 2008) (internal quotation marks omitted).  A party's reliance on an otherwise privileged communication to assert a claim or defense is similar to the type of express adoption or incorporation by reference that vitiates Exemption 5 protection -- in either case the party cannot invoke that relied-upon authority and then shield it from public view.  The references to the February 2004 memorandum that served to remove the deliberative-process privilege thus also constitute waiver of the attorney-client privilege.

On this score, the defendants invoke the same argument as they did with regard to the deliberative-process exemption -- that the instances of express adoption or incorporation cited by the plaintiff are not sufficient to withdraw the protection of

49

Exemption 5. We have concluded to the contrary with respect to the deliberative process exemption for the reasons set forth above.

The defendants urge us to revisit our holding in La Raza, contending that there we misconstrued Sears. La Raza is the law of this Circuit and this panel, acting as a panel cannot change it. See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 131 n.18 (2d Cir. 2011) (acknowledging that we are bound by the law of the Circuit as established by one or more previous panel decisions); European Cmty. v. RJR Nabisco, Inc., 424 F.3d 175, 179 (2d Cir. 2005) ("We are bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court.") (internal quotation marks omitted), cert. denied, 546 U.S. 1092 (2006).

We note nonetheless that the government focuses on the Sears Court's statement that "[t]echnically, of course, if a document could be, for example, both a 'final opinion' and an intra-agency memorandum within Exemption 5, it would be nondisclosable, since the Act 'does not apply' to documents falling within any of the exemptions." 421 U.S. at 154 n.21. That footnote was employed in the context of the Court's observation that "Exemption 5 can never apply" to "working law." Id. at 153-54. By prefacing its comment with the term

50

"technically" the Court suggested that this observation in Sears left the holding of Sears undisturbed -- that when what would otherwise be an exempt memorandum becomes non-exempt because of its status as "working law," or through express adoption or incorporation by reference, for all practical purposes it falls outside of Exemption 5.  We are, in other words, inclined to agree with the plaintiff that "[t]he text [of Sears] makes clear that the footnote is contemplating a logical impossibility." Pl.'s Br. at 52.

The government points to Federal Open Market Committee v. Merrill, 443 U.S. 340 (1979), for further support.  Merrill recognized an Exemption 5 privilege for "confidential commercial information," but noted that "[i]t should be obvious that the kind of mutually exclusive relationship between final opinions and statements of policy, on one hand, and predecisional communications, on the other, does not necessarily exist between final statements of policy and other Exemption 5 privileges." Id. at 360 n.23.  But La Raza establishes that when a document has been relied upon sufficiently to waive the deliberative-process privilege, that reliance can have the same effect on the attorney-client privilege.  411 F.3d at 360-61.  We conclude that it does so here.

51

**CONCLUSION**

For the foregoing reasons, the district court's grant of summary judgment for the plaintiff is affirmed with respect to the February 2004 memorandum, and reversed and remanded with respect to the July memoranda with instructions to the district court to enter summary judgment for the defendants as to them.